UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA McGIBONEY,<br><br>                    Plaintiff,<br><br>      v.<br><br>CORIZON; IDAHO DEPARTMENT OF CORRECTION; IDAHO BOARD OF CORRECTION; KEITH YORDY; REBEKA HAGGARD; JEFF ZMUDA; HENRY ATENCIO; DEBBIE FIELD; CINDY WILSON; DAVID McCLUSKY; RONA SIEGERT; COLIN BROWN; MURRAY YOUNG; RON SUTHERLIN; MATTHEW SWEETZER; POVAR TRIPPER; AARON HOFER; and DOES I-X,<br><br>                    Defendants. | Case No. 1:18-cv-00529-BLW<br><br>**INITIAL REVIEW ORDER BY SCREENING JUDGE** |

The Clerk of Court conditionally filed Plaintiff Joshua McGiboney's Complaint as a result of Plaintiff's status as an inmate and in forma pauperis request. The Court now reviews the Complaint to determine whether it or any of the claims contained therein should be summarily dismissed under 28 U.S.C. §§ 1915 and 1915A. Having reviewed the record, and otherwise being fully informed, the Court enters the following Order.

## 1.      Screening Requirement

The Court must review complaints filed by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity, as well as

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 1**

complaints filed in forma pauperis, to determine whether summary dismissal is appropriate. The Court must dismiss a complaint or any portion thereof that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b).

## 2.     Pleading Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint fails to state a claim for relief under Rule 8 if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In other words, although Rule 8 "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Id.* at 678, 682 (internal quotation marks omitted).

## 3.     Factual Allegations

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC") currently incarcerated at the Idaho State Correctional Center ("ISCI"). Plaintiff

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 2**

has a serious medical condition called arteriovenous malformation ("AVM"), which disrupts normal blood flow and can be life-threatening. (Compl., Dkt. 2, at 4.) Plaintiff suffers from severe pain, loss of strength and mobility, and other symptoms caused by AVM. He also uses a wheelchair.

Plaintiff states that his AVM worsened to the point that, on January 7, 2016, a nondefendant medical provider working for Corizon—the private entity providing medical care to Idaho inmates under contract with the IDOC—told Plaintiff the provider would discuss the possibility of an MRI with then-Regional Medical Director Dr. Murray Young. Another provider requested an MRI on April 25, 2016. Four days later, Plaintiff received notice that Defendant Young had denied the request. (*Id*. at 4-5.) The next time Plaintiff attempted to contact Young, in July 2016, Plaintiff was told Dr. Young was no longer the regional medical director. It is unclear from the Complaint whether Young still works for Corizon in any capacity. Dr. Rebeka Haggard then became the new Regional Medical Director for Corizon.

In September 2016—nine months after the initial recommendation for an MRI—Defendant Dr. Matthew Sweetzer examined Plaintiff. Dr. Sweetzer said that Plaintiff needed "imaging to see [the] extent of [his] condition & [a] neuro consult." (*Id*.) A nondefendant nurse then pulled Plaintiff's wheelchair out of Sweetzer's office, stating that Plaintiff's time was up. Three weeks later, Plaintiff was informed that Dr. Sweetzer was no longer at the prison and that Plaintiff "must start over again & resubmit kites for Plaintiff's issues." (*Id*.) Plaintiff claims he was denied medication and an MRI.

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 3**

Plaintiff received an ultrasound on his left leg on October 24, 2016, at St. Luke's hospital. The St. Luke's doctor, Dr. Reada, determined that "additional imaging [was] needed." (*Id*. at 6.) At Plaintiff's next appointment, with Defendant Povar Tripper in December 2016, Tripper told Plaintiff that Tripper ordered an MRI and that Plaintiff would be prescribed medication. Over three months later, Plaintiff had still not had the MRI. At that point, another provider confirmed that Plaintiff would be given an MRI and a "follow up with Dr. Ronald Sutherlin." (*Id*.) Plaintiff was not given the MRI, nor did was he evaluated by Dr. Sutherlin.

On April 13, 2017, Defendant Tripper informed Plaintiff that Defendant Haggard had once again denied Tripper's request for an MRI, despite Dr. Reada's October 2016 recommendation for additional imaging. (*Id*.) Plaintiff asked Tripper why Plaintiff was "bouncing ... around" between "lower level" providers instead of seeing a qualified medical provider. Plaintiff claims that Tripper then "lunged aggressively towards Plaintiff" and said that, "because Plaintiff filed [a] civil rights suit, he's done." (*Id*.)

It was not until November 21, 2017, that Plaintiff finally received an MRI. (*Id*. at 7.) The MRI showed advanced degenerative disc disease and a spinal cord syrinx. Plaintiff was told that Defendant Haggard and a nondefendant doctor would be notified immediately of the results of the MRI. However, instead of taking swift action to treat Plaintiff, Dr. Haggard told Plaintiff she would recommend medical parole "so Plaintiff could just have his family take him to seek his own treatment." (*Id*. at 8.)

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 4**

Defendant Haggard wrote a letter to the parole commission acknowledging that Plaintiff's MRI revealed serious problems "requiring prompt surgeries." (*Id*. at 9.) However, Dr. Sutherlin had also submitted a letter, several months earlier, that allegedly contained inaccurate information; the letter stated Plaintiff's AVM was "stable with no recommendations for surgery," that Plaintiff would not "require any special care," and that Plaintiff was "able to perform all activities of daily living." (*Id*. at 7, 9.) Dr. Sutherlin had not evaluated Plaintiff before he wrote this letter. Plaintiff was twice denied medical parole. (*Id*. at 7, 10.)

In late 2017 or early 2018, Plaintiff sustained bleeding pressure sores because the seat of his wheelchair was "sagging down onto metal bars" and "busting [his] skin open." Plaintiff also claims that "IDOC's restricted policies forced [him] to sit in blood & urine with open wounds & refuse[d] him access to showers all night & no laundry all week." (*Id*. at 8.) In February 2018, Plaintiff asked for a new wheelchair. Nondefendant medical providers informed Plaintiff that "new wheelchairs are expensive & must be approved per policy." (*Id*. at 9.) Plaintiff's request for a new chair was initially denied but later approved. Plaintiff received his new wheelchair on March 27, 2018; Plaintiff complains that the new chair is too big, and that Plaintiff is "unable to effectively propel" himself with it. (*Id*. at 10.)

On February 1, 2018, a neurosurgeon "ordered prescription Lyrica, angiogram files, immediate stint [sic] implant in syrinx, special cord foraminoctomy [sic] surgeries." (*Id*. at 8.) On February 26, 2018, Plaintiff was transported to the hospital for an

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 5**

angiogram. The doctor told Corizon that records from previous angiograms were necessary to review before the surgery, but there was some delay before Corizon provided the records to the doctor. (*Id*. at 9.)

Plaintiff had surgery on March 18, 2018, during which the doctor embolized two aneurysms. Because Plaintiff was unable to urinate, he was prescribed Urecholine; however, there was delay in getting this medication, so Plaintiff had to use catheters. (*Id*. at 10.) By the time Plaintiff actually received that medication on May 19, 2018—two months after his surgery—"it was too late and Plaintiff [is] permanently damaged." (*Id*. at 11.)

Ten days after his surgery, Dr. Haggard told Plaintiff that Corizon had denied him a medical mattress "despite Plaintiff's bruised, atrophied leg & open pressure sores." (*Id*. at 10-11.) Plaintiff was also told that Corizon was "out of catheters" and that Plaintiff would have to rinse off his used catheters and re-insert them, exposing him to a risk of "painful & dangerous kidney infections." (*Id*. at 11.) Corizon also had problems keeping bathing cloths in stock—cloths that Plaintiff used daily. When Corizon was out of such cloths, Plaintiff had to "sit in human waste until they got some." (*Id*. at 8.)

Plaintiff also complains that his "legal mail is being opened outside his presence impeding access to courts/counsel." (*Id*. at 7.) He asserts that he gave a nondefendant correctional officer an "earlier draft of this complaint" to place in the mail for him, but that the complaint was later returned to Plaintiff. Plaintiff states that someone at the

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 6**

IDOC "opened the legal mail outside of Plaintiff's presence & stopped it from going out." (*Id*. at 8.)

Plaintiff sues the IDOC, the Idaho Board of Correction, and Corizon. He also sues various individual Defendants, both identified and unidentified.

**4.      Section 1983 Claims**

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute. To state a plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To be liable under § 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Negligence is not actionable under § 1983, because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Prison officials and prison medical providers generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045. However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 7**

supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

A plaintiff can establish this causal connection by alleging that a defendant (1) "set[] in motion a series of acts by others"; (2) "knowingly refus[ed] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) failed to act or improperly acted in the training, supervision, or control of his subordinates"; (4) "acquiesc[ed] in the constitutional deprivation"; or (5) engag[ed] in "conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1205-09. A plaintiff may also seek injunctive relief from officials who have direct responsibility in the area in which the plaintiff seeks relief. *See Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1036 (9th Cir. 1999).

To bring a § 1983 claim against a municipality (local governmental entity) or a private entity performing a government function—such as Corizon—a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains, as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities performing a government function). Under *Monell*, the requisite elements of a § 1983 claim against a municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional

right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, a municipality or private entity performing a state function "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled in part on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc).

An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

A claim that a supervisor or training official failed to adequately train his or her subordinates ordinarily requires that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [supervisor or training official] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). That is, to maintain a failure-to-train claim,

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 9**

a plaintiff must allege facts showing a "pattern of violations" that amounts to deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 72 (2011). Likewise, "a failure to supervise that is sufficiently inadequate may amount to deliberate indifference" that supports a § 1983 claim, but there generally must be a pattern of violations sufficient to render the need for further supervision obvious. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks omitted). That is, if a supervisory or training official had "knowledge of the unconstitutional conditions" through such a pattern of violations—including knowledge of the "culpable actions of his subordinates"—yet failed to act to remedy those conditions, that official can be said to have acquiesced "in the unconstitutional conduct of his subordinates" such that a causal connection between the supervisor and the constitutional violation is plausible. *Starr*, 652 F.3d at 1208.

A plaintiff cannot simply restate these standards of law in a complaint. Instead, a plaintiff must provide specific facts supporting the elements of each claim and must allege facts showing a causal link between each defendant and Plaintiff's injury or damage. Alleging "the mere possibility of misconduct" is not enough. *Iqbal*, 556 U.S. at 679.

### A.    *Eighth Amendment Claims*

The Eighth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, protects prisoners against cruel and unusual punishment. Although prison conditions may be restrictive—even harsh—without violating the Eighth Amendment, prison officials are required to provide prisoners with

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 10**

adequate food, clothing, shelter, sanitation, medical care, and personal safety. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

To state a claim under the Eighth Amendment, prisoners must show that they are "incarcerated under conditions posing a substantial risk of serious harm," or that they have been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if the official knows that prisoners face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 837-45. Prison officials are not liable under the Eighth Amendment if they lacked subjective knowledge of the risk or if they responded reasonably to the risk, even if the harm ultimately was not prevented. *Id.* at 844-45. Mere negligence on the part of a prison official is not sufficient to establish liability; rather, the official's conduct must have been wanton. *Id.* at 835.

A "severe or prolonged" lack of sanitation can violate the Eighth Amendment. *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1314 (9th Cir. 1995). However, unsanitary conditions do not give rise to a constitutional violation if they are merely temporary. *Id.* at 1315. "Conditions, such as a filthy cell, may 'be tolerable for a few days and intolerably cruel for weeks or months.'" *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)).

The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). However, medical malpractice or negligence will not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin*, 974 F.2d at 1060.

Non-medical prison personnel generally are entitled to rely on the opinions of medical professionals with respect to the medical treatment of an inmate. However, if "a reasonable person would likely determine [the medical treatment] to be inferior," the fact

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 12**

that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986 (internal quotation marks omitted); *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted).

The Eighth Amendment does not provide a right to a specific treatment, *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), and differences in judgment between an inmate and prison medical providers regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim, *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *see also Lamb v. Norwood*, 895 F.3d 756, 760 (10th Cir. 2018) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."). To state an Eighth Amendment claim "involving choices between alternative courses of treatment," the plaintiff must plausibly allege "that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Stated another way, a plaintiff must plausibly allege that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 13**

prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

### i.      Defendants Haggard and Corizon

Plaintiff's Complaint, liberally construed, appears to state a colorable Eighth Amendment medical treatment claim against Defendant Haggard. Additionally, the length of time Plaintiff went without the recommended MRI—along with Plaintiff's allegation that every time he saw a new provider, he had to start at the beginning of his treatment all over again—raises a reasonable inference that the alleged lack of adequate medical treatment resulted from a policy, custom, or practice of Corizon. Thus, Plaintiff may proceed on his Eighth Amendment claims regarding his medical treatment for AVM—including his wheelchair, catheter, medical mattress, and sanitation claims— against Defendants Corizon and Haggard.

### ii.      Defendant Yordy

Because Plaintiff has not alleged that Defendant Yordy personally participated in any of the alleged Eighth Amendment violations, he has not stated a plausible damages claim against Yordy. However, because Yordy, as the warden of the prison in which Plaintiff is confined, appears to be directly responsible in the area in which Plaintiff seeks relief, *see Rounds*, 166 F.3d at 1036, Plaintiff may proceed against Defendant Yordy on his claims for injunctive relief.

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 14**

iii.     Remaining Defendants

Plaintiff has not stated a plausible Eighth Amendment claim against any other Defendant. As for the IDOC and the Idaho Board of Correction, these state entities are immune from suit in federal court absent a waiver of sovereign immunity. *Hans v. Louisiana*, 134 U.S. 1, 16-18 (1890); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Section 1983 does not constitute such a waiver, and Idaho itself has not waived its sovereign immunity for constitutional claims. *Esquibel v. Idaho*, No. 1:11-cv-00606-BLW, 2012 WL 1410105, at *6 (D. Idaho Apr. 23, 2012) (unpublished). Moreover, only a "person" may be sued pursuant to 42 U.S.C. § 1983, and a state is not considered a "person" under that statute. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

In addition to the allegations against Corizon and Haggard, Plaintiff's Complaint includes some specific allegations against Defendants Young, Sutherlin, Sweetzer, and Tripper. However, Young only treated Plaintiff for a few months before he left the prison, and Plaintiff's allegations show, at most, that Young disagreed with another provider's recommended treatment plan for Plaintiff. This is not enough to state even a negligence claim, let alone an Eighth Amendment claim. Plaintiff's allegations against Sutherlin involve only the letter to the parole commission, which will be discussed below. Though Plaintiff states that he was supposed to be examined by Sutherlin and that this did not occur, the Complaint does not suggest that this failure resulted from by any action or inaction on the part of Sutherlin.

Plaintiff's only allegations against Dr. Sweetzer show that Sweetzer *agreed* with Plaintiff that additional imaging was necessary and that Sweetzer left the prison three weeks later. Finally, though Plaintiff asserts that Tripper retaliated against him—by threatening that Plaintiff was "done" because he had filed a lawsuit, allegations that will be discussed below—the allegations regarding Tripper's recommended *medical treatment* show neither negligence nor deliberate indifference.

With respect to the other named Defendants—Defendants Zmuda, Atencio, Field, Wilson, McClusky, Siegert, Brown, and Hofer—the Complaint contains no specific allegations that any of these individuals personally participated in Plaintiff's medical treatment or that they are subject to liability as supervisors.[1] Plaintiff's allegation that Defendants have failed to train their subordinates (Compl. at 14) is nothing more than a bare conclusion that is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

Finally, Plaintiff sues various unidentified Defendants under the Eighth Amendment. Although the use of "Doe" to identify a defendant is not favored, flexibility is allowed in some cases where the identity of the parties will not be known prior to filing a complaint but can subsequently be determined through discovery. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). If the true identity of any of the Doe Defendants comes to light during discovery, Plaintiff may move to amend his Complaint to assert claims against those Defendants.

---

[1] Plaintiff does allege that Defendant Brown's medical notes, which described Plaintiff's condition in January 2016, were inaccurate. (Compl. at 4.) However, that allegation is insufficient to support a reasonable inference that Brown was personally involved with Plaintiff's later AVM treatment—the subject of the instant Complaint.

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 16**

iv.      Conclusion Re: Eighth Amendment Claims

For the foregoing reasons, Plaintiff may proceed on his Eighth Amendment claims against Defendants Haggard and Corizon, as well as Defendant Yordy for injunctive relief.

**B.      *Retaliation Claims***

Plaintiff alleges that Defendant Tripper told Plaintiff that because he had filed a civil rights action, Plaintiff was "done." (*Id*.) The Court construes this statement as a threat to withhold further medical treatment to Plaintiff because Plaintiff filed a lawsuit.[2] Such claims, alleging retaliation for protected activity, are analyzed under the First Amendment.

Prisoners' First Amendment claims, like many other types of constitutional claims, are subject to the standards set forth in *Turner v. Safley*, 482 U.S. 78 (1987). There, the United States Supreme Court examined the free speech issue in the context of prison officials prohibiting correspondence between inmates residing at different state institutions. The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.

The *Turner* Court identified four factors to consider when determining whether a prison regulation is valid: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether

---

[2] There is nothing in the Complaint to plausibly suggest that Tripper followed through with this threat.

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 17**

"there are alternative means of exercising the right that remain open to prison inmates";
(3) what "impact accommodation of the asserted constitutional right will have on guards
and other inmates, and on the allocation of prison resources generally"; and (4) whether
"ready alternatives" at a "de minimis cost" exist, which "may be evidence that the
regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89-
93.

The *Turner* analysis appropriately allows prison officials substantial leeway in the
management of their prisons because "[s]ubjecting the day-to-day judgments of prison
officials to an inflexible strict scrutiny analysis would seriously hamper their ability to
anticipate security problems and to adopt innovative solutions to the intractable problems
of prison administration." *Id.* at 89. Federal courts must apply the *Turner* test so as to
"accord great deference to prison officials' assessments of their interests." *Michenfelder
v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988).

A First Amendment retaliation claim must allege the following: "(1) An assertion
that a state actor took some adverse action against an inmate (2) because of (3) that
prisoner's protected conduct, ... that such action (4) chilled the inmate's exercise of his
First Amendment rights, and (5) the action did not reasonably advance a legitimate
correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote
omitted). Although a "chilling effect on First Amendment rights" is enough to state an
injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 18**

arbitrary retaliation" are insufficient to state a retaliation claim, *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985).

The timing of an official's action can constitute circumstantial evidence of retaliation, but there generally must be something more than simply timing to support an inference of retaliatory intent. *See Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). Retaliation is not established simply by showing adverse activity by the defendant *after* protected speech; the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating that a retaliation claim cannot rest on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'").

Not every retaliatory act taken by an official can be considered an adverse action that chills the exercise of protected speech. The proper inquiry in determining whether a plaintiff has stated a viable retaliation claim "asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotation marks omitted). If it would not, then "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted). *See also Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) ("The [*de minimis*] standard achieves the proper balance between the need to recognize valid retaliation claims and the danger of federal

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 19**

courts embroiling themselves in every disciplinary act that occurs in state penal institutions.") (internal quotation marks and alteration omitted).

Plaintiff's allegations regarding Tripper's statement, if true, shows (1) that Tripper knew Plaintiff had engaged in protected conduct and (2) that the protected conduct was the motivation behind Tripper's threat to withhold medical treatment. Further, such a threat would chill a person of ordinary firmness from engaging in protected activity and, therefore, constitutes an adverse action. Therefore, Plaintiff has plausibly alleged a retaliation claim against Defendant Tripper. Though Plaintiff also claims that "all Defendants" engaged in retaliation (Compl. at 14), he provides no specific allegations supporting a reasonable inference that any other Defendant knew that Plaintiff filed a civil rights suit, was motivated by that knowledge, and engaged in an adverse action not reasonably related to a legitimate penological goal.

### C.    *Due Process Claims*

Although Plaintiff does not specifically assert a Fourteenth Amendment claim, his allegations that he was improperly denied medical parole may implicate the Due Process Clause of that amendment. Plaintiff appears to claim that Dr. Sutherlin's inaccurate letter led to the denial of medical parole, resulting in a constitutional violation.

The Due Process Clause prohibits state action that deprives a person of life, liberty, or property without due process of law, but a person cannot obtain relief on a due process claim unless he demonstrates that he was deprived of one of these protected interests. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989). As to release on parole, the United States Supreme Court has held that there is "no

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 20**

constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," and states have no duty to establish a parole system." *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Therefore, an inmate may challenge a decision to deny parole as violative of procedural due process only when there is a *state-created* liberty interest in parole. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (per curiam). If a state statute governing parole "contains mandatory language and imposes substantive limitations on the discretion of those making the parole decision," then an inmate has a state-created liberty interest in parole and may bring a procedural due process challenge to a parole decision. *Moor v. Palmer*, 603 F.3d 658, 661 (9th Cir. 2010).

Medical parole in Idaho is governed by Idaho Code § 20-223(8), which provides that the parole commission "may parole an inmate for medical reasons. A prisoner may be considered for medical parole only when the prisoner is permanently incapacitated or terminally ill and when the commission reasonably believes the prisoner no longer poses a threat to the safety of society." Because the statute states that the commission "*may*" parole an inmate for medical reasons, and does not limit the commission's discretion in any way, Plaintiff does not have a liberty interest in medical parole. *See Moor*, 603 F.3d at 661.

Some courts previously have held that a prisoner possesses a liberty interest in having the parole commission rely only on accurate information in the prisoner's file. *See Paine v. Baker*, 595 F.2d 197, 201–02 (4th Cir. 1979). According to the Fourth

Circuit's decision in *Paine*, an inmate was entitled to relief if he could show that: (1) the information in question was actually false; (2) the erroneous information was in his central file; and (3) the erroneous information was likely to be relied upon "to a constitutionally significant degree." *Id.*

However, the Supreme Court's decision in *Greenholtz* and its later opinion in *Swarthout*—both of which held that there is no federal due process right to parole— undermine the *Paine* analysis. *See Johnson v. Rodriguez*, 110 F.3d 299, 309 (5th Cir. 1997) (internal quotation marks omitted) ("[L]anguage in *Paine* indicating a due process right to be fairly considered for parole ha[s] been invalidated by the Supreme Court's subsequent decision in *Greenholtz* ...."); *Fox v. Craven*, No. CV05-494-S-LMB, 2007 WL 2782071, at *10 (D. Idaho Sept. 21, 2007) (unpublished) ("While *Paine v. Baker*, 595 F.2d 197 (4th Cir. 1979), was formerly a widely-accepted standard for determining whether expungement claims rose to the level of a constitutional violation, more recently courts have concluded that *Paine* has been effectively overruled or modified by United States Supreme Court precedent."), *aff'd in part, appeal dismissed in part*, 320 F. App'x 675 (9th Cir. 2009). In particular, *Swarthout*'s strong language and holding—that the *only* parole-related liberty interests protected by the Due Process Clause are those created by the States themselves—lead the Court to conclude that *Paine* is no longer good law. *See* 562 U.S. at 222 ("[T]he responsibility for assuring that the constitutionally adequate procedures governing California's parole system are properly applied rests with California courts, and is no part of the Ninth Circuit's business."); *see*

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 22**

*also Stanley v. St. Paul*, 773 F. Supp. 2d 926, 929 (D. Idaho 2011) (dismissing claim that

parole hearing officer made false accusations against plaintiff and holding that, after

*Greenholtz* and *Swarthout*, "a due process interest in parole-related issues can be found

only where a state-created liberty interest exists .... No such interest exists in Idaho.").

Therefore, Plaintiff has not stated a plausible due process claim based on the

denial of his medical parole, even if the denial was based on false information regarding

his medical condition.

### D.   *Access-to-Courts and Legal Mail Claims*

Plaintiff also appears to assert claims that unidentified Defendants have deprived

him of his right to access the courts and have opened his legal mail outside his presence.

(Compl. at 7-8.)

Prisoners have a right to access the courts under the First and Fourteenth

Amendments. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). However, because the

right of access to the courts is not an "abstract, freestanding right to a law library or legal

assistance, an inmate cannot establish relevant actual injury simply by establishing that

his prison's law library or legal assistance program is subpar in some theoretical sense."

*Lewis v. Casey*, 518 U.S. 343, 351 (1996).

To state a viable access-to-courts claim, a plaintiff must plausibly allege that he

suffered an actual injury as a result of the defendant's actions. *Id.* at 349. Actual injury

may be manifest if the alleged denial of access "hindered [the plaintiff's] efforts to pursue

a legal claim," such as having his complaint dismissed "for failure to satisfy some

technical requirement," or if he "suffered arguably actionable harm that he wished to

bring before the courts, but was so stymied by [the defendants' actions] that he was unable even to file a complaint." *Id.* at 351. The Constitution does not require that inmates "be able to conduct generalized research," nor does it "guarantee inmates the wherewithal to transform themselves into litigating engines." *Id*. at 355, 360. Rather, the right of access to the courts requires only that inmates "be able to *present* their grievances to the courts—a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360 (emphasis added). Further, as with all § 1983 claims, a plaintiff cannot state an access to courts claim by alleging that a negligent act by a government official caused the actual injury of which the plaintiff complains. *Krug v. Lewis*, 852 F.2d 571 (9th Cir. 1988) (unpublished) ("While prisoners have a due process right of access to the courts, the negligent act of a public official does not violate that right.") (citing *Daniels*, 474 U.S. at 333).

The right of access to the courts is limited and applies only to direct appeals from convictions for which the inmates are incarcerated, habeas petitions, and civil rights actions regarding prison conditions. *Lewis*, 518 U.S. at 354-55; *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011) ("[P]risoners have a right under the First and Fourteenth Amendments to litigate claims challenging their sentences or the conditions of their confinement to conclusion without active interference by prison officials.") (emphasis omitted), *abrogated on other grounds by Coleman v. Tollefson*, 135 S. Ct. 1759 (2015). Thus, "[i]mpairment of any other litigating capacity is simply one of the incidental (and

perfectly constitutional) consequences of conviction and incarceration." *Lewis*, 518 U.S. at 355 (emphasis omitted).

Claims of denial of access to the courts may arise from the frustration or hindrance of "a litigating opportunity yet to be gained" (forward-looking access claim) or from the loss of a suit that now cannot be tried (backward-looking claim). *Christopher v. Harbury*, 536 U.S. 403, 413-15 (2002). To state an access to courts claim that a prisoner suffered the loss of a suit that now cannot be brought, the prisoner must allege specific facts supporting three elements: (1) official acts that frustrated the inmate's litigation activities; (2) loss of a "nonfrivolous" or "arguable" underlying claim that must be set forth in the federal complaint, including the level of detail necessary "as if it were being independently pursued"; and (3) specific allegations showing that the remedy sought in the access to courts claim is not otherwise available in another suit that could be brought. *Id.* at 415-17. "There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.* at 415.

A prisoner asserting an access to courts claim must also allege facts showing that the alleged violation of his rights was proximately caused by a state actor. *Phillips v. Hust*, 477 F.3d 1070, 1077 (9th Cir. 2007), *vacated on other grounds*, *Hust v. Phillips*, 550 U.S. 1150 (2009); *see also Crumpton*, 947 F.2d at 1420. The proximate cause analysis focuses on whether it was foreseeable that the state actor's conduct would result in a deprivation of the prisoner's right of access to the courts. *Phillips*, 477 F. 3d at 1077

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 25**

(citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 216 F.3d

764, 784-85 (9th Cir. 2000)).

Inmates also enjoy a First Amendment right to send and receive mail. *Thornburgh*

*v. Abbott*, 490 U.S. 401, 407 (1989). However, a prison or jail may adopt regulations or

practices that impinge on a prisoner's First Amendment rights if those regulations are

"reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Different

standards apply to restrictions on inmate mail, depending on whether the mail is

considered legal mail or non-legal mail. Mail from the courts, as contrasted to mail from

a prisoner's lawyer, is not legal mail. *See Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir.

1996), *as amended*, 135 F.3d 1318 (9th Cir. 1998).

Because "freedom from censorship is not equivalent to freedom from inspection or

perusal," prison officials have the right to open and to inspect legal mail from attorneys to

inmates or from inmates to attorneys. *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974).

However, prison officials may not *read* an inmate's legal mail. *Nordstrom v. Ryan*, 856

F.3d 1265, 1272 (9th Cir. 2017) (*Nordstrom II*); *Nordstrom v. Ryan*, 762 F.3d 903, 910-

11 (9th Cir. 2014) (*Nordstrom I*). "[E]ven a single instance of improper reading of a

prisoner's [legal] mail can give rise to a constitutional violation." *Mangiaracina v.*

*Penzone*, 849 F.3d 1191, 1197 (9th Cir. 2017) (Sixth Amendment context); *see also*

*Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1212 (9th Cir. 2017) ("[A] plaintiff need not

allege a longstanding practice of violating his First Amendment rights in order to state a

claim for relief on a direct liability theory.").

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 26**

Further, "prisoners have a protected First Amendment interest in having properly marked legal mail opened [and inspected] only in their presence." *Hayes*, 849 F.3d at 1211. However, the negligent opening of a prisoner's legal mail outside the inmate's presence does not rise to the level of a constitutional violation and, therefore, does not violate § 1983. *Id.* at 1218 ("An allegation that prison officials opened a prisoner's legal mail, without an allegation that the mail was deliberately and not negligently opened, is not sufficient to state a cause of action under § 1983.") (Bybee, J., concurring); *id*. at 1212 ("Hayes has alleged a plausible claim that his protected mail was *arbitrarily or capriciously* opened outside his presence on two separate occasions.") (emphasis added). Moreover, to state a colorable First Amendment claim that legal mail was opened outside the presence of an inmate, the plaintiff must allege that the mail was from an attorney and that the mail "was properly marked as 'legal mail.'" *Hayes*, 849 F.3d at 1211.

Plaintiff has not stated a plausible access-to-courts claim because he has not plausibly asserted an actual injury to his right of access. He was able to file the instant lawsuit, and the delay in doing so has not caused him to lose any claim. Plaintiff will not be allowed to proceed on some of his claims, but that is not because he filed his Complaint too late or because of some other technical deficiency caused by any Defendant's action—it is because those claims are not plausible.

Plaintiff has also failed to state a plausible legal mail claim. The Complaint alleges only that Plaintiff's legal mail was opened. He does not describe the mail as mail from an attorney, nor does he plausibly allege that any particular Defendant opened his mail or

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 27**

acted with a sufficiently culpable state of mind. Thus, Plaintiff may not proceed on his access-to-courts or legal mail claims.

## 5.  Conspiracy Claims

Plaintiff asserts that the Defendant conspired together to deprive him of his constitutional rights. The elements of such a claim are as follows: "(1) the existence of an express or implied agreement among the [defendants] to deprive him of his constitutional rights; and (2) an actual deprivation of those rights resulting from that agreement." *Ting v. U.S.*, 927 F.2d 1504, 1512 (9th Cir. 1991) (*Bivens* action relying on § 1983 case, *Dooley v. Reiss*, 736 F.2d 1392, 1394-95 (9th Cir. 1984)).

Plaintiff may not proceed on his conspiracy claims. The claims are based only on the allegations that Defendants, collectively, did not provide Plaintiff with adequate medical treatment. However, "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (case involving conspiracy claim under § 1 of the Sherman Act). Thus, the Complaint does not state a plausible conspiracy claim.

## 6.  ADA Claims

Plaintiff also asserts claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*, which prohibits discrimination on the basis of disability.

Title II of the ADA applies to an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities

provided by a public entity." 42 U.S.C. § 12131(2). Title II extends to prison inmates who are deprived of the benefits of participation in prison programs, services, or activities because of a disability. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998). In contrast to a § 1983 claim, by statutory definition a Title II ADA claim must be brought against the state or the state entity. *See U.S. v. Georgia*, 546 U.S. 151 (2006) (Title II of the ADA validly abrogates Eleventh Amendment immunity for states for conduct that actually violates the Fourteenth Amendment).

To state an ADA claim, a plaintiff must plausibly allege (1) that he has a disability; (2) that he is otherwise qualified to participate in or receive a public entity's services, programs, or activities; (3) that he was denied the benefits of those services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) that such exclusion, denial of benefits, or discrimination was *by reason of* his disability. *See Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).

Plaintiff has not alleged any facts to support an ADA claim. Plaintiff asserts he is disabled, but points to no action on the part of any Defendant that constitutes discrimination *on account of* that disability. Rather, he simply alleges that he has been subject to substandard medical treatment. But the ADA is not a remedy for inadequate medical treatment. *See Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 29**

create a remedy for medical malpractice.")). Therefore, Plaintiff's ADA claims will be dismissed as implausible.

**7.      State Law Claims of Negligence or Medical Malpractice**

Plaintiff also asserts Idaho state law claims of negligence or medical malpractice. Title 28 U.S.C. § 1367 provides that a district court may exercise supplemental jurisdiction over state claims when they are "so related" to the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution." In other words, the supplemental jurisdiction power extends to all state and federal claims which one would ordinarily expect to be tried in one judicial proceeding. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). Because the allegations here all involve a "common nucleus of operative fact," *id.*, the Court will exercise its supplemental jurisdiction over Plaintiff's state law claims.

 "In a negligence action the plaintiff must establish the following elements: '(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)). To succeed on a medical malpractice claim, a plaintiff must "affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence" that the defendant medical provider "negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided." Idaho Code § 6-1012. Additionally, a plaintiff asserting a medical malpractice

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 30**

claim against a physician also must first submit the claim to a prelitigation screening panel in accordance with Idaho Code § 6-1001.

Plaintiff has stated plausible state law claims of negligence or medical malpractice against Defendants Corizon and Haggard, as well as Defendant Yordy (for injunctive relief only[3]), for the same reasons set forth above with respect to Plaintiff's Eighth Amendment claims. Though negligence is a lower standard than that required under the Eighth Amendment, there is simply nothing in the Complaint to suggest that any other Defendant breached a duty of care with respect to Plaintiff's medical treatment.

## CONCLUSION

Plaintiff may proceed as outlined above. This Order does not guarantee that any of Plaintiff's claims will be successful; it merely finds that one or more is colorable, meaning that the claims will not be summarily dismissed at this stage. This Order is not intended to be a final or a comprehensive analysis of Plaintiff's claims, but it is only a determination that one or more of Plaintiff's claims is plausible and should proceed to the next stage of litigation.

## ORDER

**IT IS ORDERED:**

1.    Plaintiff may proceed on the following claims: (1) Eighth Amendment and

      related state law claims against Defendants Corizon and Haggard (for all

---

[3] Because there are no allegations in the Complaint to plausibly suggest that Defendant Yordy acted with (1) malice or criminal intent, (2) reckless, willful, and wanton conduct, or (3) gross negligence, he is immune from Plaintiff's damages claims pursuant to the Idaho Tort Claims Act. *See* Idaho Code §§ 6-903 through 6-904C.

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 31**

types of requested relief) and against Defendant Yordy (for injunctive relief only); and (2) a retaliation claim against Defendant Tripper. All other claims against all other Defendants are DISMISSED, and all other Defendants are TERMINATED as parties to this action. If Plaintiff later discovers facts sufficient to support a claim that has been dismissed, Plaintiff may move to amend the complaint to assert such claims.[4]

2.    Defendants Corizon, Haggard, Tripper, and Yordy will be allowed to waive service of summons by executing, or having their counsel execute, the Waiver of Service of Summons as provided by Fed. R. Civ. P. 4(d) and returning it to the Court within 30 days. If Defendants choose to return the Waiver of Service of Summons, the answer or pre-answer motion will be due in accordance with Rule 12(a)(1)(A)(ii). Accordingly, the Clerk of Court will forward a copy of the Complaint (Dkt. 2), a copy of this Order, and a Waiver of Service of Summons to the following counsel:

---

[4] Any amended complaint must contain all of Plaintiff's allegations in a single pleading and cannot rely upon or incorporate by reference prior pleadings. Dist. Idaho Loc. Civ. R. 15.1 ("Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended. The proposed amended pleading must be submitted at the time of filing a motion to amend."); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) ("[An] amended complaint supersedes the original, the latter being treated thereafter as non-existent."), *overruled in part on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, (9th Cir. 2012) (en banc); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1990) (holding that the district court erred by entering judgment against a party named in the initial complaint, but not in the amended complaint).

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 32**

a. **Mark Kubinski**, Deputy Attorney General for the State of Idaho, Idaho Department of Corrections, 1299 North Orchard, Ste. 110, Boise, Idaho 83706, on behalf of Defendant Yordy.

b. **Kevin West and Dylan Eaton,** Parsons Behle & Latimer, 800 W. Main Street, Suite 1300, Boise, Idaho, 83702, on behalf of Defendants Corizon, Haggard, and Tripper.

3.   Should any entity determine that the individuals for whom counsel for the entity was served with a waiver are not, in fact, its employees or former employees, or that its attorney will not be appearing for the entity or for particular former employees, it should file a notice within the CM/ECF system, with a copy mailed to Plaintiff, indicating which individuals for whom service will not be waived.

4.   If Plaintiff receives a notice from Defendants indicating that service will not be waived for an entity or certain individuals, Plaintiff will have an additional 90 days from the date of such notice to file a notice of physical service addresses of the remaining Defendants, or claims against them will be dismissed without prejudice without further notice.

5.   The parties must follow the deadlines and guidelines in the Standard Disclosure and Discovery Order for Pro Se Prisoner Civil Rights Cases, issued with this Order.

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 33**

6.     Dispositive motions must be filed no later than 300 days after entry of this Order.

7.     Each party must ensure that all documents filed with the Court are simultaneously served upon the opposing party (through counsel if the party has counsel) by first-class mail or via the CM/ECF system, pursuant to Federal Rule of Civil Procedure 5. Each party must sign and attach a proper mailing certificate to each document filed with the court, showing the manner of service, date of service, address of service, and name of person upon whom service was made.

8.     The Court will not consider ex parte requests unless a motion may be heard ex parte according to the rules and the motion is clearly identified as requesting an ex parte order, pursuant to Local Rule of Civil Practice before the United States District Court for the District of Idaho 7.2. ("Ex parte" means that a party has provided a document to the court, but that the party did not provide a copy of the document to the other party to the litigation.)

9.     All Court filings requesting relief or requesting that the Court make a ruling or take an action of any kind must be in the form of a pleading or motion, with an appropriate caption designating the name of the pleading or motion, served on all parties to the litigation, pursuant to Federal Rule of Civil Procedure 7, 10 and 11,

and Local Rules of Civil Practice before the United States District Court for the District of Idaho 5.1 and 7.1. The Court will not consider requests made in the form of letters.

10.    No party may have more than three pending motions before the Court at one time, and no party may file a motion on a particular subject matter if that party has another motion on the same subject matter currently pending before the Court. Motions submitted in violation of this Order may be stricken, summarily denied, or returned to the moving party unfiled.

11.    Plaintiff must notify the Court immediately if Plaintiff's address changes. Failure to do so may be cause for dismissal of this case without further notice.

12.    Pursuant to General Order 324, this action is hereby returned to the Clerk of Court for random civil case assignment to a presiding judge, on the proportionate basis previously determined by the District Judges, having given due consideration to the existing caseload.

DATED: February 11, 2019

B. Lynn Winmill
U.S. District Court Judge

**INITIAL REVIEW ORDER BY SCREENING JUDGE - 35**