UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA McGIBONEY, | Case No. 1:18-cv-00529-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| CORIZON; IDAHO DEPARTMENT OF CORRECTION; ALBERTO RAMIREZ; REBEKAH HAGGARD; and JARED POVAR | |
| Defendants. | |

# I. INTRODUCTION

This case involves medical malpractice, negligence, and deliberate indifference claims brought by inmate Joshua McGiboney against Defendants Corizon Health, Inc. ("Corizon"), Dr. Rebekah Haggard, and Warden Alberto Ramirez.[1] McGiboney also brings a First Amendment retaliation claim against Defendant Jared Povar, another Corizon healthcare provider.

Pending before the Court are Defendants' Joint Motion in Limine to Preclude Plaintiff from Presenting Expert Witness Testimony at Trial (Dkt. 63); Warden Ramirez's Motion for Summary Judgment (Dkt. 68); Corizon, Dr. Haggard, and Povar's (the

---

[1] Additional named defendants were dismissed in the Court's Initial Review Order. Dkt. 7. Pursuant to Federal Rule of Civil Procedure 25(d), Warden Ramirez is substituted in this action for former Idaho State Correctional Institution Warden Keith Yordy.

"Corizon Defendants") Motion for Summary Judgment (Dkt. 69); and the Corizon Defendants' Motion to Strike (Dkt. 75).[2] The Court heard oral argument on the pending motions on January 21, 2021, and took the matters under advisement.

For the reasons stated herein, the Court will GRANT the Defendants' Joint Motion in Limine, GRANT Warden Ramirez's Motion for Summary Judgment, GRANT the Corizon Defendants' Motion for Summary Judgment, and DENY the Corizon Defendants' Motion to Strike as MOOT.

## II. FACTS

### A. Factual and Procedural Background

Plaintiff Joshua McGiboney has been an Idaho Department of Correction ("IDOC") inmate since 2008. In 2004, McGiboney was diagnosed with a congenital condition known as spinal arteriovenous malformation ("AVM"). In general, AVM is an abnormal tangle of blood vessels connecting arteries and veins, which disrupts normal blood flow and oxygen circulation. McGiboney's AVM causes him to suffer severe pain, loss of strength and mobility that generally confines him to a wheelchair, impaired bowel and bladder functions, and other symptoms.

Until July 1, 2014, McGiboney was incarcerated in a private prison, Idaho Correctional Center ("ICC"), which was not managed by the State of Idaho. Defendant Corizon did not provide medical care for ICC. In July of 2014, the State of Idaho took control of the prison, and ICC's name changed to Idaho State Correctional Center

---

[2] Warden Ramirez also joined in the Motion to Strike. Dkt. 77.

("ISCC"). Corizon started administering medical care and treatment to inmates at ISCC at this time.

In 2011, while in the private prison, McGiboney experienced a hemorrhage in his spinal cord as a result of his AVM. McGiboney was treated at St. Luke's Boise Medical Center. The neurosurgeon who treated McGiboney, Dr. Ronald Jutzy, noted resection surgery was not an option due to the risk of permanent stroke to McGiboney's spinal cord.[3] Dr. Jutzy concluded that McGiboney is not expected to have a significant further recovery, and that he is permanently incapacitated and unable to walk without supportive devices. Dr. Jutzy stated his only recommendation would be to have McGiboney's case reviewed at the Barrow Neurological Institute in Phoenix, Arizona. Later, in 2012, McGiboney was seen by neurosurgeon Dr. Paul Montalbano, who also discussed the high risk of resection surgery and recommended against surgical intervention.

After the 2011 event, McGiboney filed a lawsuit for deliberate indifference under 42 U.S.C. § 1983 against his treating physician at that time, Dr. David Agler, and Corrections Corporation of America ("CCA"), the private entity that managed ICC. The jury in the 2011 suit found Dr. Agler was deliberately indifferent to McGiboney's medical needs during a two-week time period in May of 2011, and that McGiboney was harmed as a result. McGiboney was awarded $11,000.00 in compensatory damages and $25,000.00 in punitive damages.

---

[3] Resection surgery is a surgery to remove an AVM. Because McGiboney's AVM is located inside the front part of his spinal cord, where all motor function sits, resection surgery to remove McGiboney's AVM would essentially cause "guaranteed paraplegia." Dkt. 69-7, at 41:10–23.

McGiboney filed the instant suit on November 20, 2018. McGiboney alleges the Corizon Defendants have been deliberately indifferent in treating his AVM, and seeks, *inter alia*, compensatory damages, punitive damages, and "release from incarceration to pursue proper medical treatment." Dkt. 2, at 16–17.

Before turning to the facts relevant to McGiboney's claims and the pending motions, the Court must first briefly address the Preliminary Injunction it entered on July 11, 2019 (the "PI Order"). Dkt. 40. Four months after filing his Complaint, McGiboney, proceeding (at that time) pro se, filed a Motion for Temporary Restraining Order and Preliminary Injunction ("PI Motion").[4] Dkt. 10. The Court granted the PI Motion in part and denied it in part. The Court denied McGiboney's request for medical parole but ordered Defendants to provide McGiboney with adequate medical treatment for his AVM.

On summary judgment, McGiboney quotes liberally from the PI Order, and uses it in support of several of his contentions. *See, e.g.*, Dkt. 73-1, at 4, 9–10, 18. However, as the Court explained in the PI Order, and again in its Order denying the Corizon Defendants' Motion to Amend, the PI Order was largely based on the Corizon Defendants' failure to respond to most of McGiboney's allegations regarding his inadequate medical care. Dkt. 40, at 6 n. 8, 7–9, 16–19; Dkt. 60, at 7–9, 11, 13–14, 19–21.

Although the Court found McGiboney satisfied the elements of a preliminary injunction on the record before it at the time the PI Order was issued, the record is much different on summary judgment. Defendants have now submitted evidence to refute

---

[4] McGiboney retained an attorney approximately one month after the Court entered the PI Order and has been represented by such counsel since that time.

McGiboney's allegations regarding his medical care. The Court addresses such evidence below, but highlights the issue here to illustrate the PI Oder was neither a preliminary adjudication on the ultimate merits, nor binding on summary judgment. *Sierra On-Line v. Phoenix Software, Inc*., 739 F.2d 1415, 1421–23 (9th Cir. 1984).

**B**. **McGiboney's Medical Care**

*1. Events leading up to the 2017 MRI*

The facts at issue on summary judgment involve McGiboney's medical care beginning on December 6, 2016.[5] On this date, McGiboney was seen by Defendant Jared Povar, a Nurse Practitioner for Corizon, to discuss pain medication adjustments. Povar wrote the following in McGiboney's medical record: "Pt [patient] in to discuss pain meds for AVM in back . . . Says Montalbano and Jutzy recommended surgery – need records. Pt went over exercises with WC [wheelchair] pusher,[6] but has new pusher, would like to see PT [physical therapist]." Dkt. 73-2, ¶ 9. Povar also prescribed McGiboney medication for

---

[5] McGiboney's Complaint was filed on November 20, 2018. Because there is a two-year statute of limitations for actions under 42 U.S.C. §1983, McGiboney cannot raise claims regarding treatment and care which accrued before November 20, 2016. *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004) ("For actions under 42 U.S.C. § 1983, courts apply the forum state's statute of limitations for personal injury actions[.]"); *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 926 (9th Cir. 2004) (explaining Idaho Code section 5-219(4) provides a limitations period of two years for personal injury actions). Grievances and grievance appeals filed outside of the two-year statute of limitations period for § 1983 claims cannot serve as a basis for liability. *Mintun v. Blades*, No. CV-06-139-S-BLW, 2008 WL 711636, at *13 (D. Idaho Mar. 14, 2008). McGiboney does not respond to the Corizon Defendants' contention that the medical care he received before November 20, 2016, is outside of the statute of limitations. The first instance of medical care within the statute of limitations McGiboney addresses on summary judgment is his December 6, 2017 visit with Povar.

[6] A "pusher" is an individual who pushed McGiboney when he was in his wheelchair.

his urinary incontinence.[7]

On February 3, 2017, McGiboney was seen by Physician Assistant Anthony Bushnell for a follow-up appointment regarding his medications. McGiboney's urinary incontinence issue was also addressed. During the visit, McGiboney reported that his pain control was "good" under his current regimen. Dkt. 45-1, at 24.[8]   On February 24, 2017, McGiboney was seen for his request for a back brace.[9] During this visit, McGiboney reported "no new or worsening symptoms." *Id*. at 26. On March 8, 2017, McGiboney had another appointment with Povar regarding his urinary issue, and McGiboney's medication was increased.

On March 27, 2017, McGiboney was treated by Physician Assistant Daniel Dellwo. Dellwo noted: "Pt [Patient] feels well, but over the course of the last few months he has experienced more pain . . . . Pt has been almost able to walk for the first time in 6 years and he is happy about that." Dkt. 45-5, at 1. Dellwo put in a request for McGiboney to get an MRI, stating:

> This pt was dx with AVM 10 years prior. 6 years prior pt became weak and could not walk. He has had several evaluations by neurosurgeons and risks of surgery are great. He has not been evaluated by a neurosurgeon in 3 years or had an MRI since that time. Pt is experiencing some increased pain in the last few months, but no additional weakness or other sx's. Pt's AVM was stable in 2014, but due to increased pain and the hx of AVM evolving in the

---

[7] Although McGiboney alleged in his Complaint that Povar stated he ordered an MRI during the December 6, 2016 visit, McGiboney does not raise this allegation on summary judgment. Povar's treatment notes from December 6, 2016 also do not reference an MRI. Dkt. 45-1, at 23–4.

[8] With the exception of citations to deposition transcripts, page citations are to the ECF-generated page number for the referenced docket number. Deposition transcripts are cited with the docket number and page and line cites from the transcript.

[9] The back brace was provided on March 9, 2017. Dkt. 69-2, ¶ 18.

> past I believe an MRI would be helpful and appropriate to ensure this lesion
> is remaining stable.

Dkt. 45-5, at 7.

On March 29, 2017, Corizon's Medical Director, Dr. Rebekah Haggard, considered Dellwo's MRI request. Dr. Haggard did not see McGiboney, but reviewed McGiboney's medical records and determined an MRI was not medically indicated at that time since McGiboney's neuro function had improved, which is not consistent with progression of AVM. Dr. Haggard concluded McGiboney's neurological function had improved because he reported he was able to walk some, which was a marked advancement from a 2015 physical assessment when his left leg strength was 0/5. Dkt. 69-2, ¶ 19. In addition, Dellwo's March 27, 2017 treatment notes stated McGiboney did not have additional weakness or other symptoms. Dkt. 45-5, at 1. In denying the MRI request, Dr. Haggard noted, "[s]ince surgical risk is too great and patient is doing well, an MRI will not change management. If patient has neuro symptoms, please resubmit." Dkt. 45-5, at 7.

On April 13, 2017, McGiboney was seen by Povar to discuss Dellwo's MRI request. This visit is the basis for McGiboney's First Amendment retaliation claim against Povar, and the Corizon Defendants and McGiboney dispute what occurred. Povar's treatment notes state he informed McGiboney the MRI request had been denied due to McGiboney's reported improved neurological function, which is not consistent with AVM progression. Povar's notes state:

> When discussing this with the patient, he became upset, stating "I don't know
> why he'd (Dellwo) say that, that's not true." Pt continued on stating that he
> needed more physical therapy, that last time he did it, they didn't work with
> him, but showed his pusher what to do. At that point I interrupted, reminding

him that we had a similar discussion before and I discussed it with Physical therapy who denied such a practice. To which the pt incredulously responded, "you're going to take their word over mine?" When I answered affirmatively, pt became upset, saying "First you interrupt me, then you don't believe me. I'll get my lawyers involved and sue you too" and left.

Dkt. 45-5, at 1.

By contrast, in his Complaint, McGiboney alleges:

April 13, 2017 [Povar] said RMD Haggard denied the MRI order again. Plaintiff asked why Corizon is bouncing him around to many different lower level "provider" nurses instead of simply setting appointment with a single physician[] who's actually qualified to treat him, & asked why does the RMD Haggard refuse to meet & keeps denying MRI/treatment orders the providers order. Plaintiff wrote every party. [Povar] lunged aggressively towards Plaintiff. Plaintiff was scared & wheeled back out of office. [Povar] said because Plaintiff filed civil rights suit, he's done.

Dkt. 2, ¶ 39.

After the April 13, 2017 incident with Povar, McGiboney was seen regularly by Corizon providers over the next few months, and his neuro function continued to show improvement. For instance, on June 22, 2017, McGiboney stated at a chronic care follow-up that he was "doing well" and "starting to exercise and use[] his wheelchair to ambulate and push[] it with his pusher in it." Dkt. 69-1, ¶ 21.[10] Treatment notes from McGiboney's physical therapy appointment on June 28, 2017, reported McGiboney "is now able to wear his AFO [ankle foot orthotic] and walk around the track next to the Annex using a cane. He works out at the gym doing stretches, leg lifts, ball therex from previous PT sessions." *Id*. At a physical therapy session on July 5, 2017, McGiboney stated, "I feel like I am seeing

---

[10] This means McGiboney was actually the one standing and pushing someone else who was sitting in his wheelchair. *Id*.

some changes and that gives me hope." *Id*. During his physical therapy appointment on July 26, 2017, McGiboney said, "I like walking and trying to go to the gym to use the machines there," and the physical therapist noted that McGiboney was "functionally independent with his assistive devices." *Id*. On summary judgment, McGiboney does not dispute that he showed improved neurological function in the months following the incident with Povar.

On September 29, 2017, McGiboney was seen in the chronic care clinic and reported "lately, the right side-hip/glut area of my body feels tight." *Id*., ¶ 22. McGiboney also reported mid to upper left back pain and concerns about urination. The treating nurse forwarded McGiboney's complaints for follow-up. McGiboney was seen by Physician Assistant Diana Dice on October 10, 2017. During this appointment, McGiboney reported worsening symptoms, including that his right side, which had always been fine, was giving him problems. McGiboney also stated he was having back spasms, pain, and that his left leg was giving out. Dice submitted a request for an MRI due to McGiboney's new and worsening symptoms. On October 26, 2017, Dr. Haggard determined an MRI was medically indicated, and the MRI was ordered on October 30, 2017.

McGiboney had the MRI on November 21, 2017, which revealed "progression of the distal cord syrinx below T7-T11" and "advanced degenerative disc disease with severe right foraminal stenosis" in vertebrae L3-4. *Id*., ¶ 23. McGiboney's imaging was sent to off-site neurosurgeon specialist, Dr. Montalbano, for review. Dr. Montalbano recommended evaluation by a vascular neurosurgeon specialist, Dr. Ondrej Choutka. McGiboney was first seen by Dr. Choutka on February 1, 2018. Dr. Choutka noted baseline

weakness in McGiboney's left leg, but worsening symptoms in his right leg.

A spinal angiogram was conducted on February 26, 2018. During a follow-up visit with Dr. Choutka on February 27, 2018, Dr. Choutka recommended—and McGiboney agreed to proceed with—endovascular treatment of the AVM, followed by surgical placement of a syringo-subarchnoid shunt, combined with foraminotomy for nerve root decompression.[11] Dr. Choutka did not plan a resection surgery and stated during his deposition that embolization was McGiboney's best treatment option. Dkt. 69-7, at 46:1–12.

### 2. *2018 Surgeries and post-operative care*

On March 19, 2018, Dr. Dallas Peck performed a spinal angiogram and embolization of AVM procedure. On March 21, 2018, Dr. Choutka completed a Right L3-L4 foraminotomy for nerve root decompression and Right T9 hemilaminectomy and insertion of syringo-subarchnoid shunt without complication. There were no indications of an acute or recent hemorrhage of McGiboney's AVM. Following the surgeries and his discharge from the hospital, the Corizon Defendants contend McGiboney received close follow-up care in the prison infirmary. Dkt. 69-2, ¶ 25. Corizon maintains all prescribed medications were administered, and other necessary things, such as catheters, were also provided. *Id*. Dr. Haggard ordered an egg crate mattress to be made available for McGiboney upon his discharge from the infirmary, and also ordered "more aggressive

---

[11] Embolization is an endovascular treatment where a glue-like agent is injected into the artery to stop blood flow into the AVM, thereby decreasing the risk of repeated hemorrhages. Dkt. 69-7, 41:10–42:5.

offsite PT and a consult for AFO/KAFO brace for LLE during rehab."[12] *Id.*, ¶ 26.

In his Complaint, McGiboney alleged Dr. Choutka prescribed him Urecholine after his surgery in March 2018, but that Corizon did not provide McGiboney with Urecholine until May 19, 2018, causing him to suffer permanent incontinence. Dkt. 2, ¶¶ 68, 73. In addition, McGiboney alleged that after his surgeries, Corizon gave him with a wheelchair that was too big for him to effectively use, and Dr. Haggard also informed McGiboney that Corizon "decided Plaintiff must sit on metal bunk with worn out pad & will not get a medical mattress, despite Plaintiff's bruised, atrophied leg & open pressure sores on Glute & Hip." Dkt. 2, ¶¶ 69–70.

The Corizon Defendants present evidence to refute such allegations on summary judgment, to which McGiboney does not respond. Dkt. 69-2, ¶¶ 25–29 (citing Dkt. 45, ¶¶ 54–58). In fact, McGiboney does not address the allegations in his Complaint regarding his 2018 mattress, wheelchair,[13] prescription for Urecholine, or access to bath cloths, in his Response to the Corizon Defendants' Motion for Summary Judgment. *See generally* Dkt. 73-1; Dkt. 73-2. McGiboney does raise the issue of his access to catheters on summary judgment and testified during his deposition that he was forced to reuse catheters after his

---

[12] A KAFO is a knee, ankle, foot orthotic.

[13] In his SDF, McGiboney does reference two grievances he filed in 2019 (a year after his 2018 surgeries) regarding his wheelchair, as well as one grievance he filed on March 30, 2020, requesting, *inter alia*, a fitted wheelchair. Dkt. 73-2, ¶¶ 44, 56, 68. McGiboney does not address such grievances in his Response brief and does not argue Dr. Haggard (or any other Defendant) failed to provide him with a fitted wheelchair. On summary judgment, McGiboney concedes his claims regarding Urecholine, his mattress, his wheelchair, and his access to bath cloths, by failing to address them. *Image Tech. Serv., Inc. v. Eastman Kodak,* 903 F.2d 612, 615 n. 1 (9th Cir. 1990) (finding that plaintiff's failure to raise an issue in opposition to defendant's motion for summary judgment waived the issue).

2018 surgeries when Corizon ran out of catheters. Dkt. 73-2, ¶ 75. The Corizon Defendants counter there is no limitation on the number of catheters an inmate can use, and inmates who need catheters are given new catheters and are never required to reuse them. Dkt. 69-2, ¶ 28.

Following his March 19, 2018 procedures, Dr. Haggard referred McGiboney offsite to Saint Alphonsus Rehabilitation Services ("STARS") to undergo extensive rehabilitation. During this time, McGiboney received regular treatment onsite and follow-up appointments with specialists at St. Alphonsus. Dkt. 69-2, ¶ 30. On June 21, 2018, Dr. Peck performed a second embolization. Following the procedure, an MRI on July 23, 2018, showed "significant improvement in the appearance of the spinal AVM and associated extensive thoracic syrinx." *Id*.

On July 26, 2018, Dr. Choutka noted McGiboney "continues to improve" and that he "underwent second stage embolization with complete obliteration of the AVM now." Dkt. 45-6, at 60. Dr. Choutka stated he would "check on [McGiboney] in 3-6 months." *Id*. at 60. Dr. Choutka also recommended "ongoing aggressive physical therapy," that McGiboney should "continue with bladder training program and regular straight catheter," and that McGiboney "should probably continue on Urecholine." *Id*. The Corizon Defendants note, and McGiboney does not dispute, that Urecholine was available at the prison but McGiboney chose not to continue taking it. Dkt. 69-2, ¶ 30.

*3. Physical Therapy*

The parties dispute whether or not McGiboney received the aggressive physical therapy recommended by Dr. Choutka. The Corizon Defendants contend McGiboney

received extensive physical therapy at STARS from April 6, 2018, until he was discharged on November 21, 2018, when his progress plateaued. The Corizon Defendants note Dr. Choutka testified during his deposition that he believed "the prison was trying to provide the best possible conditions" for McGiboney, and stated he did not have any concerns about the post-op care Corizon provided McGiboney, including physical therapy. Dkt. 69-8, at 65:9–11, 67:13–15, 68:15–18.

However, during his deposition, McGiboney testified he did not receive the aggressive physical therapy Dr. Choutka prescribed. Dkt. 73-9, Ex. 11 at 333:6–334:1. McGiboney also implies his STARS physical therapy was prematurely cancelled when his daughter wrote his STARS Physical Therapist, Christine Olen, a letter asking Olen to write a short letter to the parole commission outlining McGiboney's injury, disability, and threat level to the community. The parties also dispute the events surrounding McGiboney's daughter's letter.

Specifically, during a medical transport of McGiboney to STARS on October 26, 2018, a transport officer overheard Olen tell McGiboney, "oh by the way, your daughter wrote me a letter and it was adorable." Dkt. 73-2, ¶ 31. McGiboney responded, "yes she is a sweetheart." *Id*. The transport officer filed an Information Report Form with IDOC, recounting the conversation and noting, "[u]nsure if this is a security issue." Dkt. 73-8, at 4. Later that day, ISCI Captain Gretchen Woodland[14] emailed Corizon Health Services

---

[14] On March 1, 2016, IDOC transferred McGiboney from ISCC to the Idaho State Correctional Institution ("ISCI"). Dkt. 68-1, ¶ 17. On January 24, 2020, McGiboney was returned to ISCC, where he is currently housed. *Id*.

Administrator Aaron Hofer to ask if McGiboney could "see a different physical therapist," because Woodland was "concerned about the personal connection" between Olen and McGiboney. *Id*. at 6. Woodland also noted she was "going to have investigation take a look into this." *Id*. Hofer responded, "please let us know asap if a change is necessary so we can help with that transition and ensure [McGiboney] is getting off-site [physical therapy] three times a week." *Id*.

In an October 27, 2018 email between IDOC and Corizon staff, Nurse Amanda Tillemans advised Hofer, "we are working to get [McGiboney's] care transferred to another therapist. The one question I have is how much information should we be sharing with STARS at this time? They are going to ask why we are requesting a change from the one therapist that has been seeing him for continuity of care over the last several months." *Id*. at 13. Hofer responded "[a]re you open to me sitting Christine down and going over expectations before we make any moves? I think I can stress the importance of boundaries and the expectations from a security perspective. Thoughts?" *Id*. It is unclear whether Tillamans responded, but in an October 31, 2018 to November 1, 2018 email chain with the subject line "McGiboney's Schedule," Hofer asked to see McGiboney's physical therapy schedule. *Id*. at 12. Corizon scheduler Tomi Takeda responded "[h]e is scheduled 3x week through 11/21/18." *Id*. at 11.

After Takeda's response, five emails in the chain follow between various individuals, including Hofer, Warden Ramirez, Deputy Warden Randy Valley, and IDOC Chief of Prisons Ashley Dowell. *Id*. at 8–10. The emails each contain the subject line "McGiboney's Schedule," but are so heavily redacted that only the "sent to" information

and signature of each sender is disclosed.[15] *Id*. McGiboney suggests his physical therapy abruptly ended on November 2, 2018, and that Olen advised him his appointments with her "would soon be ending" due to "an insurance related matter . . . referred to as a therapeutic break." Dkt. 73-2, ¶ 35. However, Deputy Warden Valley suggests Corizon did not discontinue McGiboney's therapy, but instead decided to discuss the incident with Olen. Dkt. 68-7, ¶ 12. On November 2, 2018, Hofer and Valley met with Olen and outlined security concerns and boundaries when working with inmates. *Id*. Valley noted Olen seemed receptive and that he also later discussed the incident with McGiboney. *Id*.

McGiboney implies he was prematurely discharged from STARS due to IDOC and/or Corizon's interference after his daughter's letter. McGiboney also testified during his deposition that his STARS physical therapy was cancelled "because Corizon doesn't want to pay for it." Dkt. 73-9, Ex. 11 at 333:18–20. Corizon counters that Olen discharged McGiboney several weeks after the November 2, 2018 meeting because "his progress had plateaued." Dkt. 69-2, ¶ 30. McGiboney filed this suit the day before his STARS physical therapy ended on November 21, 2018.

*4. Care Following McGiboney's Discharge from STARS*

On December 26, 2018, McGiboney had his six-month follow-up examination and an MRI with Dr. Matthew Pond, at which time an "interval increase in size of the known spinal AVM" was noted. Dkt. 69-2, ¶ 31. On March 22, 2019, another spinal angiogram

---

[15] In its Reply brief, IDOC contends the emails were redacted for confidential, privileged statements including attorney-client communications, attorney work product, and a joint defense privilege between IDOC and Corizon in *Balla, et al. v. Idaho Board of Correction et al.*, No. 1:81-cv-01165-BLW. Dkt. 76, at 10 n. 1.

was performed, revealing a recurrence of the known spinal AVM. A new consultation request for neurosurgery and interventional radiology follow-up was approved on April 5, 2019. The St. Alphonsus Interventional Radiology ("IR") Clinic scheduled McGiboney for its first available appointment on June 11, 2019.

On June 3, 2019, McGiboney obtained a letter from two physicians at the Barrow Neurological Institute—the facility Dr. Jutzy referenced after McGiboney's hemorrhage in 2011—recommending intervention. Specifically, the letter stated: "First, an MRI of Thoracic spine with and without contrast will be needed, followed by a repeat spinal angiogram with possible re-embolization of the lesion. After the spinal angiogram and MRI, we recommend surgical removal of the lesion." Dkt. 73-7, at 17. As further discussed below, Defendants seek to strike this letter as lacking foundation and inadmissible hearsay.[16]

On June 11, 2019, McGiboney was seen at the IR Clinic for review of his March 22, 2019 angiogram. Prior to the appointment, McGiboney's imaging was reviewed by the Interventional Neuroradiology team, as well as by Dr. Choutka, who agreed treatment with embolization was recommended. Dkt. 69-2, ¶ 32. When Dr. Choutka's recommendation was relayed to McGiboney, he expressed frustration that he had not been seen by Dr. Choutka since his post-surgery follow-up and asked to meet with Dr. Choutka to discuss surgical options and a treatment plan. Dkt. 73-2, ¶ 47.

McGiboney had an appointment with Dr. Choutka on July 30, 2019. Dr. Choutka's

---

[16] On October 21, 2019, McGiboney's counsel obtained a letter from Dr. Jutzy recommending evaluation at the Barrow Institute. *Id*. at 21. Defendants also move to strike Dr. Jutzy's letter.

Progress notes from the visit state: "Recommend re-embolization of spinal AVM/T9 segment. No neurosurgical intervention indicated at this time. Patient denies embo at this time. Patient would like to transfer his care to Dr. Ducruet at the [Barrow Institute]. We have no objections to this."[17] Dkt. 45-7, at 19. Although he initially declined the embolization recommended by Dr. Choutka, McGiboney ultimately agreed to have the procedure.[18] On October 17, 2019, another embolization was performed without complications. Following the October 2019 embolization, McGiboney underwent physical therapy at both the prison and offsite at St. Alphonsus, including pool therapy. Dkt. 69-2, ¶ 34. McGiboney also received epidural steroid injections and medications for pain management. *Id*.

In May 2020, McGiboney complained of new symptoms, and on May 30, 2020, another MRI and spinal angiogram were ordered. The MRI was completed on June 24, 2020, and revealed a slight "interval decrease in abnormal enhancement involving serpiginous appearing vessels in the ventral aspect of the spinal canal at the level of T7 and T8 compared to study dated December 26, 2018." Dkt. 73-7, at 25. The MRI Report concluded the "study is otherwise not significantly changed[.]" *Id*. On July 2, 2020, McGiboney received a spinal angiogram, revealing "a small amount of residual or recurrent

---

[17] On August 1, 2019, Dr. Choutka's Physician Assistant submitted a letter stating: "Joshua McGiboney has been partly under our medical care since February 2018. He would like to pursue evaluation at the Barrow Neurological Institute." Dkt. 73-7, at 20. When questioned about this letter during his deposition, Dr. Choutka explained it was not a treatment recommendation or referral but was written at the instigation of McGiboney's daughter because McGiboney wanted to pursue an evaluation at the Barrow Institute. Dkt. 69-8 at 87:2–25, 88:1–17.

[18] After his July 30, 2019 visit with Dr. Choutka, McGiboney submitted a number of grievances and inmate concern forms regarding his medical care and his desire to be treated at the Barrow Institute.

spinal AVM nidus" which "would be difficult to cannulate." *Id*. at 28.

Dr. Choutka reviewed McGiboney's 2020 MRI and angiogram results and developed a follow-up treatment plan. Dkt. 69-8 at 83:23–84:11, 89:7–14. The treatment plan included another angiogram in six months to a year, with an evaluation visit prior to the angiogram. *Id*. at 89:5–25. Dr. Choutka testified McGiboney's AVM "actually looks very good," and that there is nothing urgent or emergent about McGiboney's condition at this time. *Id*. at 90:1–13.

With respect to an MRI, Dr. Choutka clarified if McGiboney develops progressive weakness in the future, it would warrant an MRI "roughly once a year, not necessarily for the rest of his life, but for the time -- for the time being." Dkt. 73-9, Ex. 12 at 99:22–100:4. Dr. Choutka also confirmed adequate treatment for McGiboney's AVM is available locally, and that he could perform a resection surgery if McGiboney should need one in the future. Dkt. 69-8 at 83:4–87:8. Dr. Choutka explained that because McGiboney still has movement in his legs, a resection surgery is not currently recommended given the risk of instant paralysis. *Id*. at 81:2–5. McGiboney does not dispute Dr. Choutka's testimony in his Response to the Corizon Defendants' Motion for Summary Judgment.

## 5. IDOC's Grievance Process

IDOC offers a grievance process for inmates to address their concerns. This process requires inmates to first seek an informal resolution by completing an Offender Concern Form, to then submit a Grievance Form, and finally, to file an appeal. Upon completion of the Offender Concern Form, Grievance Form, and Grievance Appeal, the grievance process is complete and an inmate has exhausted his or her administrative remedies.

At the first level, the inmate must submit the Offender Concern Form to the person most capable of responding, which is Corizon staff for medical issues. If the inmate is unsatisfied with the response, he can submit a Grievance Form. For medical issues, Corizon staff also provides the review and response to Grievance Forms. Each grievance is limited to one issue and must be filed within 30 days after the incident or problem occurred. The grievance must specify the nature of the complaint—as well as the date, place, and names of individuals involved—and must also suggest a solution.

Upon receipt of a Grievance Form, the facility Grievance Coordinator enters it into the Corrections Integrated System ("CIS") electronic database. If the Grievance Form is completed correctly, the Grievance Coordinator assigns the grievance to first level staff to respond. After the first level staff responds to the Grievance Form, a second level reviewing authority reviews the matter and grants, denies, or modifies the suggested solution. The Grievance Coordinator logs the response in CIS and then delivers it to the inmate.

If an inmate appeals the grievance response, the Grievance Coordinator forwards it to an appellate authority. At IDOC, the appellate authority for medical grievances is Health Services Director Nurse Rona Siegert. McGiboney highlights Siegert testified during her deposition that she has no authority to question or change orders written by Corizon's providers when reviewing an appeal, stating, in part, "I cannot grant something that I don't have the authority to order. I cannot order tests. I cannot order medication. I can't order off-site visits with other providers." Dkt. 73-2, ¶ 81 (citing Dkt. 73-9, Ex. 9 at 18:6–20). Siegert also clarified the contract between IDOC and Corizon does not include a provision to allow IDOC officials—including the Warden—to directly influence or modify the

treatment inmates receive from Corizon providers. If an inmate does not agree with Siegert's response to their appeal of a grievance, there is no other recourse. Dkt. 73-9, Ex. 10 at 96:18–97:24.

### 6. McGiboney's Grievances

In his Combined Statement of Disputed Facts ("SDF"), McGiboney details multiple grievances he filed between April 18, 2017, and July 17, 2020.[19] To the extent McGiboney raises such grievances with respect to his claims of inadequate medical care, the Court addresses them below.

### 7. Utilization Management

Corizon employs a utilization management system to manage requests by Corizon providers for medical services such as testing, offsite visits, etc. McGiboney highlights neither Siegert nor IDOC can override any decisions made by Corizon's utilization management team. During her deposition, Dr. Haggard described her understanding of the utilization management system is that a Corizon provider enters their consult with an inmate in the medical record, and the consult is then sent to Corizon's utilization management team for review. Currently, almost all offsite care goes through utilization management. Because Corizon's "all-risk" contract with IDOC requires Corizon to shoulder the expense for inmate care, McGiboney contends Corizon uses the utilization management system to deny necessary medical care to save money. Dkt. 73-1, at 21.

Corizon disputes McGiboney's characterization, noting its utilization management

---

[19] McGiboney outlines one grievance he filed against IDOC, and twenty-nine Offender Concern Forms and/or grievances he submitted to Corizon regarding his medical care.

process does not "deny" or "not approve[]" requests for offsite care. Dkt. 74, at 16. Rather, if a reviewing provider believes a request for offsite care is not medically necessary, an "alternative treatment plan" is recommended back to the site provider. Dkt. 69-13 at 41:11–42:1. The site provider can either acknowledge and agree with the alternate treatment plan, or they can go through an appeals process. *Id*. at 42:13–18. The local regional medical director can also ultimately override the original determination by utilization management. *Id*. at 25:12–18. Dr. Haggard explained an alternative treatment plan is more of a "collegial suggestion to try something else, or a thought -- you know, was this taken into consideration, perhaps, a different course of action" rather than a denial of care. Dkt. 69-12 at 47:3–7. Dr. Haggard testified, "it's up to the provider who ordered the test, or the consultant, to determine [whether an alternative treatment plan] is reasonable. And if it's not, it can be appealed, and the regional medical director can still overturn those." *Id*. at 47:8–12.

Having outlined the lengthy background of this dispute, the Court turns to the legal standards for the pending motions.

## III. LEGAL STANDARDS

### A. Motion in Limine to Preclude Expert Testimony

Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose their expert witnesses. The timing of disclosure of both case-in-chief and rebuttal experts is committed to the court. Fed. R. Civ. P. 26(a)(2)(D). If a party fails to identify a witness as required by Rule 26(a), the party is not allowed to use that witness at trial unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

"Rule 37(c)(1) is a 'self-executing,' 'automatic' sanction designed to provide a strong inducement for disclosure." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (citing *Yeti v. Molly Ltd.*, 259 F.3d 1101, 1107 (9th Cir. 2001)). The burden of preventing the sanction by showing the failure to disclose was substantially justified or harmless is on the party facing the sanction. *Id*.

### B. Motion to Strike Inadmissible Evidence at Summary Judgment Phase

Rule 56 makes clear that only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). However, in determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment. *Id.* at 1037 (explaining evidence containing hearsay produced in an affidavit may be considered on summary judgment if the declarant could later present the evidence through direct testimony).

### C. Summary Judgment

Summary judgment is appropriate where the moving party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). One of the principal

purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Id*. at 322. It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those "that might affect the outcome of the suit under the governing law." *Id.* at 248. Summary judgment is not appropriate if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The Court does not make credibility determinations at this stage of the litigation, as such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp*., 976 F.2d 497, 507 (9th Cir. 1992). In considering a motion for summary judgment, the Court must also "view[] the facts in the non-moving party's favor[.]" *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

However, the Court need not accept allegations by the non-moving party if such allegations are not supported by sufficient evidence. *Anderson*, 477 U.S. at 249. A nonmoving party cannot simply question the credibility of the movant to foreclose

summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). Instead, the nonmoving party "must go beyond the pleadings and by its own evidence 'set forth specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (noting that the nonmoving party must "identify with particularity the evidence that precludes summary judgment."). "If the evidence is colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (cleaned up).

### D. Deliberate indifference

McGiboney contends the Defendants have subjected him to inadequate medical treatment in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. With respect to medical care for inmates, the Eighth Amendment is violated when prison officials demonstrate "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to establish deliberate indifference, an inmate must satisfy objective and subjective components of a two-part test. *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991). First, the prisoner must show a "serious medical need" by "demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (cleaned up).

Second, the inmate must show that the defendant's "response to the need was deliberately indifferent." *Id*. To satisfy the second prong—that the defendant's response to a serious medical need was deliberately indifferent—a plaintiff must show both that: (1) the course of treatment the defendant chose was medically unacceptable under the

circumstances; and (2) the defendant chose this course in conscious disregard of an excessive risk to the plaintiff's health. *Edmo v. Corizon*, 935 F.3d 757, 786 (9th Cir. 2019) (citations omitted). Thus, a deliberate indifference claim against a medical provider requires a showing that the defendant acted with subjective recklessness. *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994).

The subjective component is intended to preclude a finding of deliberate indifference for accidents or inadvertent or even negligent failure to provide medical care. *Estelle*, 429 U.S. at 105–06; *Hutchinson v. United States*, 838 F.2d 390, 394 (1988); *Farmer*, 511 U.S. at 835 ("ordinary lack of due care" is insufficient to establish deliberate indifference). As such "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. To state a cognizable Eighth Amendment claim, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards or decency in violation of the Eighth Amendment." *Id*. (cleaned up).

To bring a constitutional claim under § 1983 against a municipality or other government entity, a plaintiff cannot rely on respondeat superior liability.[20] *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 691 (1978). Under *Monell*, a municipality or entity is subject to liability only if: (1) the plaintiff was deprived of a constitutional right; (2) the entity had

---

[20] Where, as here, an inmate claims a private entity like Corizon has violated his constitutional rights, the plaintiff must meet the test articulated in *Monell. Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1138–40 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law).

a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

## IV. ANALYSIS

Following the Court's Initial Review Order, McGiboney's remaining claims are for violation of the Eighth Amendment and related state law claims against Corizon and Dr. Haggard, a First Amendment retaliation claim against Povar, and Eighth Amendment and related state law claims against Warden Ramirez (for injunctive relief only). Dkt. 7, at 31–32. On July 14, 2020, Defendants filed a Joint Motion in Limine to preclude McGiboney from presenting expert witness testimony at trial. Dkt. 63. On September 30, 2020, Warden Ramirez and the Corizon Defendants filed their respective motions for summary judgment. Dkt. 68; Dkt. 69. After McGiboney responded to the motions, the Corizon Defendants filed a Motion to Strike certain evidence submitted with McGiboney's Response. Dkt. 75. Warden Ramirez joined in the Corizon Defendants' Motion to Strike. Dkt. 77. The Court will briefly address the procedural motions, and then turn to the motions for summary judgment.

### A. Joint Motion in Limine (Dkt. 63)

Defendants ask the Court to preclude McGiboney from presenting expert witness testimony at trial. Defendants seek exclusion because McGiboney did not disclose any experts by the Court ordered June 15, 2020 expert witness disclosure deadline (Dkt. 59), and also did not disclose any experts in response to the Corizon Defendants' discovery

requests for information regarding any potential experts. McGiboney initially responded that the Motion in Limine was premature and procedurally improper, but, on summary judgment, concedes he does not have an expert witness. Dkt. 73-1, at 17–18.

Although the Motion in Limine is essentially moot given McGiboney's concession, the Court notes McGiboney failed to identify an expert witness as required by Rule 26(a), and has also never attempted to show this failure was substantially justified or harmless. As such, McGiboney is precluded from offering expert testimony in his case-in-chief at trial pursuant to Rule 37(c)(1). *Yeti*, 259 F.3d at 1106. To the extent it is not moot, the Motion in Limine is accordingly GRANTED.

### B.  Joint Motion to Strike (Dkt. 75)

Defendants seek to strike two paragraphs of McGiboney's SDF and two corresponding exhibits. First, Defendants move to strike paragraph 46 of the SDF, which references a letter from two physicians at the Barrow Neurological Institute, and also move to strike the letter itself (Dkt. 73-7, at 17). Next, Defendants seek to strike paragraph 61 of the SDF, which references a letter from Dr. Jutzy—McGiboney's treating physician in 2011—and also seek to strike the letter itself (Dkt. 73-7, at 21).

Defendants make, and McGiboney counters, many arguments regarding the admissibility of the aforementioned letters. As explained below, however, McGiboney cannot defeat Defendants' Motions for Summary judgment even if the letters are considered. The Motion to Strike is accordingly DENIED as MOOT.

### C.  Summary of Arguments on Summary Judgment

In their Motion, the Corizon Defendants argue Corizon and Dr. Haggard are entitled

to summary judgment on McGiboney's Eighth Amendment and related state law claims because: (1) McGiboney failed to exhaust his administrative remedies under the Prison Litigation Reform Act; (2) McGiboney does not have any medical experts, the omission of which is fatal to his state law claims and Eighth Amendment deliberate indifference claim; (3) the Corizon Defendants' medical experts agree that McGiboney's medical care and treatment was appropriate; and (4) McGiboney failed to present sufficient evidence to support the conclusory allegations in his Complaint. The Corizon Defendants also argue summary judgment should be granted on McGiboney's First Amendment retaliation claim against Povar because there is no evidence Povar was aware of McGiboney's protected activity or that McGiboney's First Amendment rights were chilled as a result of any actions taken by Povar.

In his Motion for Summary Judgment, Ramirez argues McGiboney's claim for inadequate medical care against him, in his official capacity as Warden, is barred by *Ex parte Young*, 209 U.S. 123 (1908). Alternatively, Ramirez joins in the Corizon Defendants' Motion for Summary Judgment and contends he is entitled to summary judgment because there are no facts to support McGiboney's Eighth Amendment claims. Ramirez also argues McGiboney failed to exhaust his administrative remedies on all but one claim against Ramirez (that IDOC denied McGiboney access to gym equipment) and maintains there are no genuine issues of material fact to support McGiboney's claim that IDOC denied him access to gym equipment. Finally, Ramirez contends he is entitled to summary judgment on McGiboney's tort claims of negligence because McGiboney never filed a Notice of Tort Claim as required by the Idaho Tort Claims Act.

In his Responses to the two motions, McGiboney concedes his state law negligence and medical malpractice claims fail against all Defendants. Dkt. 73, at 2 n. 1; Dkt. 73-1, at 2 n. 2, 17 n. 48. McGiboney's state law negligence and malpractice claims are accordingly dismissed. McGiboney also concedes he does not have an expert witness, and did not exhaust his administrative remedies with respect to most of his claims. However, McGiboney argues, for the first time,[21] that he was excused from exhausting administrative remedies because IDOC's medical grievance process is essentially a sham that makes administrative remedies "unavailable" to IDOC inmates. Dkt. 73, at 22 (citing *Ross v. Blake*, 136 S. Ct. 1850, 1858–60 (2016) (holding an inmate's duty to exhaust administrative remedies does not "come into play" when "an administrative procedure is unavailable [because] . . . it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.").

McGiboney highlights IDOC's three-level grievance process for medical complaints ends with an appeal to Nurse Siegert. As mentioned, during her deposition, Siegert testified that she has no authority to question or change orders written by Corizon providers when deciding an appeal. As such, McGiboney suggests IDOC has an unconstitutional policy of delegating all medical decisions to Corizon—a for-profit contracted medical provider—in an attempt to avoid accountability for the medical care provided to inmates. In addition, McGiboney notes almost all offsite care for inmates goes through Corizon's utilization management process. Because Corizon bears the risk for the

---

[21] McGiboney alleged in his Complaint that he had exhausted all administrative remedies and grievances with respect to each of his claims. Dkt. 2, ¶ 76.

costs of medical care provided to inmates under its contract with IDOC, and because IDOC has no authority to override decisions made by Corizon's utilization management team, McGiboney argues the utilization management system creates a conflict of interest that incentivizes Corizon to deny inmates offsite treatment. McGiboney contends that if IDOC's grievance policy and Corizon's utilization management system "allowed for any review of medical denials of care *independent* of Corizon with its financial conflict of interest—at least some of [his] injuries would have been avoided." Dkt. 73-1, at 25 (emphasis in original).

McGiboney devotes the bulk of his Responses to his arguments regarding IDOC's grievance process and Corizon's utilization management system. With respect to the Corizon Defendants' Motion, McGiboney also argues expert testimony is not mandatory in deliberate indifference cases where a layperson can adequately understand the evidence, and suggests there are questions of fact precluding summary judgment on his claims of deliberate indifference against Corizon and Dr. Haggard. McGiboney also contends there are questions of fact regarding Povar's knowledge of McGiboney's protected speech activity, but fails to address the other elements of a First Amendment retaliation claim.

With respect to Ramirez, McGiboney argues *Ex parte Young* is not applicable because McGiboney seeks to enjoin IDOC policies related to medical care which are enforced by Warden Ramirez in violation of the Eighth Amendment. Dkt. 73, at 15 (citing *Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014)) (explaining personal involvement of a prison warden is not required, and the warden is a proper defendant, when a plaintiff challenges an unconstitutional policy of the prison and the warden is the official

within the prison who could appropriately respond with injunctive relief)). The rest of McGiboney's Response to Ramirez's motion is devoted to his arguments regarding IDOC's grievance process.

Regardless of whether McGiboney was excused from exhausting his administrative remedies because IDOC's grievance process is "unavailable," whether Ramirez is an appropriate defendant under *Ex parte Young*, or whether Corizon's utilization management system provides an incentive for Corizon providers to deny care, McGiboney fails to survive either motion for summary judgment because he does not establish a genuine issue of material fact with respect to the constitutionality of his medical care. While the Corizon Defendants' independent physician expert witnesses, as well as McGiboney's treating neurosurgeon, Dr. Choutka, contend McGiboney's treatment was appropriate and within the standard of care, McGiboney does not offer any evidence—apart from his own opinion—to show the treatment he received for his AVM was inadequate. "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Fleming v. LeFevere*, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006).

McGiboney contends "there is a genuine issue of material fact with respect to whether Corizon's pattern and practice of not allowing any independent review of its medical decisions was the 'moving force' behind [his] injuries," and asks the Court to declare "that, for purposes of McGiboney's Eighth Amendment claims related to medical care, the Warden has authority to ensure that the care provided McGiboney . . . at least meets constitutional minimums[.]" Dkt. 73-1, at 25–26; Dkt. 73, at 26. Yet, McGiboney

fails to first establish that his medical care *did not* meet constitutional minimums. McGiboney's Eighth Amendment claims cannot survive summary judgment because he neglects to show his medical care was constitutionally inadequate.

Because McGiboney's deliberate indifference claims against the Corizon Defendants and Warden Ramirez hinge on the constitutionality of his medical care, the Court turns first to the Corizon Defendants' Motion for Summary Judgment.

### D. Corizon Defendants' Motion for Summary Judgment (Dkt. 69)

#### 1. Failure to Exhaust Administrative Remedies

The Corizon Defendants first argue that McGiboney failed to exhaust his administrative remedies with respect to many of the claims of inadequate medical care he alleged in his complaint. Dkt. 69-1, at 7. The Prison Litigation Reform Act ("PLRA") imposes a mandatory requirement that inmates must exhaust administrative remedies before bringing civil rights actions. 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). Exhaustion allows prison officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Bock*, 549 U.S. at 204. "This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Id*. (citation omitted).

Proper exhaustion requires compliance with all levels of a prison's administrative review process in accordance with deadlines and other critical procedural rules before filing a lawsuit. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). However, an inmate need only

exhaust those remedies that are "available"—that is, an inmate must exhaust "those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). As noted, McGiboney concedes he did not exhaust his administrative remedies with respect to most of his claims, but argues there are no administrative remedies "available" for him to have exhausted with respect to all grievances related to his medical care. Dkt. 73-1, at 10, 14–17.

A prisoner's failure to exhaust administrative remedies is an affirmative defense which the defendant must plead and prove. *Jones*, 549 U.S. at 216. On summary judgment, if a defendant initially shows that: (1) an available administrative remedy existed; and (2) the plaintiff failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). If the plaintiff fails to meet this burden, the court should dismiss the unexhausted claims or action without prejudice. *Lira v. Herrera*, 427 F.3d 1164, 1170 (9th Cir. 2005). If a genuine dispute exists as to the material facts relating to an exhaustion defense such that summary judgment is inappropriate, the Court may decide the disputed facts in an appropriate preliminary proceeding, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue." *Albino*, 747 F.3d at 1170–71.

As discussed above, McGiboney suggests IDOC's grievance process is unavailable because "it operates as a simple dead end—with officers unable or consistently unwilling

to provide any relief to aggrieved inmates." Dkt. 73-1, at 16 (quoting *Ross*, 136 S. Ct. at 1858). Before addressing this contention, the Court may first review McGiboney's claims for a triable issue of deliberate indifference. "[T]he PLRA exhaustion requirement is not jurisdictional, and thus allow[s] a district court to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies." *Woodford*, 548 U.S. at 101. The Court accordingly turns first to the issue of whether McGiboney received constitutionally inadequate medical care. If he does not establish a genuine issue for trial with respect to Defendants' purported deliberate indifference, McGiboney's exhaustion argument need not be addressed.[22]

### 2. *Expert Witness Testimony*

The Corizon Defendants next argue McGiboney's lack of expert testimony is fatal to his deliberate indifference claim. While expert testimony is not always required to support a claim for deliberate indifference based on medical care, "in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert testimony will almost always be necessary to establish the necessary level of deliberate indifference." *Shields v. Cannon*, No. 2:11-CV-3185 JAM AC P., 2015 WL 1258536, at *15 (E.D. Cal. March 18, 2015), *subsequently aff'd Shields v. Jones*, 719 Fed. Appx. 545 (9th Cir. 2017); *see also Wolfe v. Idaho Dep't of Correction*, No. 1:13-CV-00227-EJL,

---

[22] Because the Corizon Defendants' argument with respect to exhaustion is an affirmative defense to McGiboney's Eighth Amendment claim, the Court need not consider the defense—or McGiboney's challenge to it—if McGiboney's Eighth Amendment claim fails on summary judgment.

2015 WL 4458862, at *8 (D. Idaho July 21, 2015) (finding plaintiff's deliberate indifference claims failed in the absence of expert testimony).

McGiboney counters that unlike medical malpractice claims, expert testimony is not mandatory in deliberate indifference cases because the test for deliberate indifference "is more closely akin to criminal law than tort law," and does not "demand that the jury consider probing, complex questions concerning medical diagnosis and judgment." Dkt. 73-1, at 17 n. 49 (quoting *Ledford v. Sullivan*, 105 F.3d 354, 359 (7th Cir. 1997)). McGiboney argues courts "have concluded that expert testimony is not mandatory to prove a deliberate indifference claim; at least in some cases, a layperson can adequately understand the evidence such that expert testimony is not always required." *Id*. (quoting *Reidhead v. Arizona*, No. CV-12-00089-PHX-JAT, 2014 WL 2861046, at *5 (D. Ariz. June 24, 2014)).

In *Reidhead*, the court determined plaintiffs' deliberate indifference claim did not require expert testimony because it did not involve the nuanced details of a medical diagnosis or appropriate medical treatment for a medical condition. 2014 WL 2861046, at *5. Instead, plaintiffs' claim was based on defendants' failure to respond to an inmate's medical complaints, failing to monitor the inmate after she told them she was having left arm and chest pains and trouble breathing, failing to respond to the inmate's requests for help, and failing to check on the inmate after observing her "lying on her back with her head turned toward the wall and her legs draped over the edge of the bunk." *Id*. at *1, 5. The court determined "most people are familiar with the symptoms of a heart attack and there is no evidence that a jury would require expert testimony to evaluate [defendant's]

response to [the inmate's] pleas for help." *Id*. at *5.

By contrast, McGiboney's claims for deliberate indifference involve whether Dr. Haggard and Corizon provided adequate medical care for his spinal AVM—a complex and rare medical condition treated by neurosurgeon specialists.[23] Dkt. 69-22, at 5, 19. Although the parties do not dispute that McGiboney's AVM constitutes a serious medical need, they do dispute whether McGiboney received appropriate medical care for his AVM. A layperson is unlikely to have heard of spinal AVM, let alone be capable of assessing the appropriate medical treatment for this condition.[24]

In addition, plaintiffs in *Reidhead* notably had an expert witness—a board-certified cardiologist—to testify that the symptoms the inmate presented were "classic for an acute coronary syndrome" and that 911 should have been called. *Id*. at *4. The *Reidhead* plaintiffs' expert also provided an opinion as to the care the inmate would have received had she been taken to a hospital, and the likelihood that such care would have saved the inmate's life. *Id*. Defendants in *Reidhead* sought summary judgment because plaintiffs did not have an expert witness qualified to testify as to the appropriate standard of care applicable to a pill nurse employed by the Arizona Department of Corrections. *Id*. at *5. The *Reidhead* court rejected this contention because a layperson could understand the

---

[23] McGiboney's AVM is particularly complicated because it is "largely on the front side of (anterior) and buried deeply into the spinal cord." *Id*. at 4. These two primary factors make McGiboney's spinal AVM "a very difficult and risky lesion for open microsurgical resection." *Id*.

[24] The Court recognizes McGiboney's implication that the Court itself determined McGiboney was likely to succeed on his deliberate indifference claim at the preliminary injunction stage, and thus illustrated a layperson *is* capable of ascertaining whether Corizon's care was deliberately indifferent. Dkt. 73-1, at 18. Again, however, the PI Order was based on a limited record and McGiboney's largely unrebutted allegations regarding the Corizon Defendants' purported denial of adequate medical care. As explained below, such contentions have now been refuted by documentary evidence and expert testimony.

symptoms of a heart attack and could evaluate whether the pill nurse's response was deliberately indifferent when the inmate exhibited such symptoms. Here, McGiboney does not have an expert witness to attest to the care McGiboney should have received, or whether such care would have had any impact on his symptoms and condition. This represents another fundamental difference between this case and *Reidhead*. While plaintiffs in *Reidhead* had a medical expert to testify as to injury and causation, McGiboney does not. *Id*. at *6 n. 6.[25]

On summary judgment, McGiboney argues Dr. Haggard was deliberately indifferent to his serious medical needs because she denied the MRI provider Dellwo requested for McGiboney on March 27, 2017. McGiboney also suggests Dr. Haggard may be liable for supervising others who discontinued McGiboney's physical therapy at STARS and who failed to provide McGiboney with a sufficient supply of catheters. Dkt. 73-1, at 5, 19. McGiboney also contends Corizon was deliberately indifferent by using its "secret utilization management system"—in conjunction with IDOC's sham grievance process— to deny care to inmates. *Id*. at 21. With respect to specific care he was purportedly denied as a result of Corizon's policy, McGiboney implies Corizon was deliberately indifferent in denying him an MRI in March of 2017, and in cutting short his physical therapy in 2018, as a part of its utilization management process. *Id*. at 25.

Given McGiboney's complicated vascular and neurological condition, expert

---

[25] An inmate alleging deliberate indifference must also demonstrate that the defendant's actions were the proximate cause of their injuries. *Conn v. City of Reno*, 591 F.3d 1081, 1098–1101 (9th Cir. 2010), *vacated by City of Reno v. Conn*, 563 U.S. 915 (2011), *reinstated in relevant part* 658 F.3d 897 (9th Cir. 2011).

testimony is essential to understanding both whether an MRI in March of 2017, or additional offsite physical therapy in November of 2018, were medically indicated; whether the Corizon Defendants intentionally disregarded a significant risk to McGiboney's health when they denied McGiboney an MRI, additional offsite physical therapy, and an adequate catheter supply; and whether such decisions caused McGiboney harm. *Jett*, 429 F.3d at 1096 (explaining the subjective prong of a deliberate indifference claim is satisfied by showing a purposeful failure to respond to a prisoner's medical need and harm cause by the indifference). McGiboney's deliberate indifference claims fail as a matter of law because McGiboney concedes he does not have an expert witness to testify at trial.

However, even if the Court held expert testimony is not essential to McGiboney's Eighth Amendment claims, McGiboney fails to establish a genuine issue of material fact with respect to the constitutionality of his medical care.

### 3. Claims against Dr. Haggard

#### a. March 2017 MRI Request

McGiboney first contends Dr. Haggard was deliberately indifferent in denying Physician Assistant Dellwo's MRI request on March 27, 2017. McGiboney suggests "Defendant Haggard's denial of the MRI ordered by Dellwo . . . runs counter to the recommendations of McGiboney's neurosurgeon, Dr. Choutka, who saw McGiboney at the request of Corizon." Dkt. 73-1, at 19. This is inaccurate. Dr. Choutka did not treat McGiboney prior to February of 2018. Thus, Dr. Haggard's initial denial of Dellwo's MRI request on March 27, 2017, could not run counter to Dr. Choutka's recommendations.

There is no testimony or evidence in the record to suggest Dr. Choutka ever expressed an opinion on whether McGiboney should have received an MRI in March of 2017. Nor is there testimony or evidence from any other provider or expert to suggest an MRI was necessary in March of 2017.

McGiboney also notes Dr. Choutka recommended yearly MRIs, and that he has only had three MRIs since 2011. As such, McGiboney argues he did not receive the annual MRIs recommended by Dr. Choutka. Dkt. 73-1, at 11. However, McGiboney has received three MRIs since November of 2017, and cannot assert claims for inadequate medical treatment prior to November 20, 2016. *Hoak v. Attorney General*, No. 1:12-cv-00550-BLW, 2013 WL 2382722, at *3 (May 29, 2013) (holding an inmate's claims for inadequate medical care which occurred outside of the two-year statute of limitations for § 1983 may not be pursued).

In addition, Dr. Choutka did not recommend yearly MRIs until August 28, 2020. Dkt. 73-2, ¶ 29. The Court cannot find Dr. Haggard failed to follow Dr. Choutka's recommendation of yearly MRIs when it has been less than one year since Dr. Choutka made this recommendation, as well as less than one year since McGiboney's most recent MRI on June 24, 2020. Dkt. 69-2, ¶ 34. Moreover, Dr. Choutka only recommended yearly MRIs if McGiboney develops progressive weakness. Dkt. 73-9, Ex. 12, at 99:22–100:4. Thus, whether McGiboney will need yearly MRIs in the future will "be guided" by future "symptoms on his exams" and is not something either Dr. Haggard or the Court can assess at this time. *Id*.

To the extent McGiboney implies Dellwo's MRI request is evidence that an MRI

was medically necessary,[26] a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient to establish deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1059–60 (9th Cir. 2004); *see also Estelle*, 429 U.S. at 107 ("[T]he question of whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). As such, Dellwo's MRI request is insufficient to establish a question of fact with respect to McGiboney's claim that Dr. Haggard was deliberately indifferent in denying him an MRI on March 27, 2017.

Further, as the Corizon Defendants note, Dr. Haggard did not simply deny the MRI in March of 2017, but instead determined McGiboney's improved neurological function was not consistent with AVM progression and suggested an MRI was not medically necessary at the time. Dkt. 69-12, at 36:6–25. Dr. Haggard directed medical to resubmit the MRI request if McGiboney developed worsening neuro symptoms. *Id*. In the fall of 2017, when McGiboney did exhibit worsening neurological function, Dr. Haggard ordered an MRI. Dkt. 69-2, ¶ 22. Dr. Haggard thus imposed an alternative treatment plan of waiting to see if McGiboney presented symptoms of AVM progression to suggest an MRI was necessary before ordering such testing. Once such symptoms arose, Dr. Haggard ordered an MRI.

"To prevail on a claim involving choices between alternative courses of treatment,

---

[26] *See, e.g.*, Dkt. 73-2, ¶¶ 10–13, 18–19, Dkt. 73-1, at 20.

a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (cleaned up). Apart from his personal disagreement with Dr. Haggard's initial denial of the MRI,[27] McGiboney does not present any evidence to show Dr. Haggard's course of treatment was medically unacceptable—let alone that it was chosen in conscious disregard of an excessive risk to his condition. Instead, all of the evidence in the record suggests Dr. Haggard's decision was appropriate.

For instance, the Corizon Defendants' expert, neurosurgeon Harold D. Pikus, M.D.,[28] extensively reviewed McGiboney's medical records and agreed with Dr. Haggard's conclusion that an MRI was not medically indicated in March of 2017. Dr. Pikus concluded an MRI was not needed at that time given McGiboney's improved strength and ability to walk, as well as in the absence of any signs of hemorrhage or other symptoms that would have called for an MRI. Dkt. 69-22, at 11–13, 17. Dr. Pikus explained:

> In my opinion, there was no need to send Mr. McGiboney for an MRI or to see an offsite specialist to address his AVM between July 2014 and fall of 2017 when he then got an MRI and subsequently saw Dr. Choutka. Such intervention would typically be required if Mr. McGiboney had a hemorrhage or symptoms consistent with a hemorrhage, and not when he was stable or improving functionally. Additionally, in Fall 2017, when Mr. McGiboney demonstrated <u>new and different</u> symptoms indicative of possible AVM progression, he was appropriately referred offsite for MRI/angiogram workups and to be seen by offsite specialists.

---

[27] McGiboney's "opinion as to the appropriate course of care does not create a triable issue of fact because he has not shown that he has any medical training or expertise upon which to base such an opinion." *Fleming*, 423 F. Supp. 2d at 1070.

[28] Dr. Pikus has evaluated and treated more than 500 patients with various forms of AVM. Dkt. 69-22, at 2.

*Id*. at 17 (emphasis in original).

In the absence of any evidence to the contrary, the Court cannot find Dr. Haggard failed to adequately respond to McGiboney's AVM when she initially denied the MRI request in March of 2017. McGiboney has not established either that an MRI was medically indicated at that time or that Dr. Haggard knew of and disregarded an excessive risk to McGiboney's health when she denied Dellwo's MRI request. *Farmer*, 511 U.S. at 837.

Finally, to the extent McGiboney implies the seven-month delay between Dr. Haggard's initial denial of the MRI in March 2017, and her subsequent authorization of the MRI in October of 2017, constituted deliberate indifference, a delay in medical treatment does not alone constitute an Eighth Amendment violation; the delay must have caused substantial harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990); S*hapley v. Nevada Bd. of State Prison Commissioners*, 766 F.2d 404, 407 (9th Cir. 1985) (explaining mere delay of surgery, without more, is insufficient to establish deliberate indifference).

To maintain a cognizable § 1983 claim, there must be a showing that a defendant's conscious and deliberately indifferent delay in providing care caused further injury. *Jett*, 439 F.3d at 1096; *Hallett*, 296 F.3d at 746 (finding there was no Eighth Amendment violation where plaintiffs could not demonstrate that delays in dental care caused "problems so severe [as to] cause significant harm and that Defendants should have known this to be the case"); *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) (affirming directed verdict on inmate's Eighth Amendment claim where inmate did not offer evidence that delay in receiving antibiotics for infection caused him harm). McGiboney does not

offer any evidence to show he suffered harm as a result of the delay of his 2017 MRI. Instead, the undisputed evidence illustrates McGiboney's neuro function continued to show improvement in the months following March 2017.

Specifically, McGiboney reported at a chronic care follow-up on June 22, 2017, that he was "doing well" and "starting to exercise and use[] his wheelchair to ambulate and push[] it with his pusher in it." Dkt. 69-2, ¶ 21. During a physical therapy appointment on June 28, 2017, McGiboney reported that "he is now able to wear his AFO and walk around the track next to the Annex using a cane. He works out at the gym doing stretches, leg lifts, ball therex from previous PT sessions." *Id*. At a physical therapy session on July 5, 2017, McGiboney stated, "I feel like I am seeing some changes and that gives me hope." *Id*. The physical therapy notes for July 5, 2017, recorded McGiboney "has been working out and staying independent with the use of his assistive devices." *Id*. During his physical therapy appointment on July 26, 2017, McGiboney stated "I like walking and trying to go to the gym to use the machines there" and the physical therapist noted McGiboney is "functionally independent with his assistive devices." *Id*.

It was not until September 29, 2017, that McGiboney first reported his right side, which had before always been fine, was giving him problems. *Id*., ¶ 22. Approximately two weeks later, McGiboney also complained of back spasms, pain, and that his left leg was giving out. A new request for an MRI was submitted, and Dr. Haggard approved the request. She did so after determining an MRI was medically indicated given McGiboney's new symptoms, which suggested possible worsening neurological functioning. Dkt. 45, ¶ 43. Dr. Pikus explains McGiboney was appropriately referred offsite for MRI/angiogram

MEMORANDUM DECISION AND ORDER - 43

workups in the fall of 2017 because that is when he first illustrated symptoms indicative of possible AVM progression. Dkt. 69-22, at 17.

McGiboney does not offer any evidence to counter Dr. Pikus's conclusions. Instead, McGiboney contends that whether Corizon's utilization management program had an effect on Dr. Haggard's decision to deny his MRI in March of 2017 is a question of fact precluding summary judgment. Dkt. 73-1, at 5, 19. McGiboney notes, "[d]epending on her subjective intent," Dr. Haggard "may be liable on McGiboney's § 1983 claims[.]" *Id*. at 19. This argument ignores the first part of the subjective standard for deliberate indifference. A provider is deliberately indifferent only where they: (1) choose a course of treatment that was medically unacceptable under the circumstances; and (2) choose this course of treatment in conscious disregard of an excessive risk to the plaintiff's health. *Edmo*, 935 F.3d at 786. On summary judgment, McGiboney fails to submit evidence to suggest the course of treatment Dr. Haggard chose with respect to his 2017 MRI was medically unacceptable.

In the absence of any contradicting evidence—whether through expert testimony, recommendations from his treating providers, or any other probative evidence to suggest Dr. Haggard's initial MRI denial was medically inappropriate—McGiboney fails to show this denial violated the Eighth Amendment. *See, e.g., Kamakeeaina v. City & Cty. of Honolulu*, No. 11-00770 JMS/RLP, 2014 WL 1691611, at *18 (D. Haw. Apr. 29, 2014) (granting summary judgment on prisoner's Eighth Amendment claim against his treating physician where plaintiff submitted "no affidavits from any physician or mental health care provider that controvert[ed] [physician defendant's] professional medical opinion or

show[ed] that [physician's] failure to prescribe Plaintiff medication or assure he received therapy while a pretrial detainee at OCCC was medically unacceptable under the circumstances."); *Elliot v. Reddy*, No. 2:10-cv-02980 MCE KJN P., 2014 WL 1877566, at *26 (E.D. Cal. May 9, 2014) (granting summary judgment in favor of prison physician where plaintiff failed to present contradicting expert evidence, "or any other remarkable evidence of record" to contradict defendant's expert's opinion that physician's treatment met the appropriate standard of care).

In short, there is no evidence to show that Dr. Haggard's decision was medically unacceptable under the circumstances. Because all of the evidence in the record suggests Dr. Haggard's decision was medically appropriate, she could not have recklessly disregarded a serious risk to McGiboney's health in denying the MRI in March of 2017. McGiboney's argument that Dr. Haggard was financially motivated fails as a matter of law because, regardless of her purported motivation,[29] Dr. Haggard's decision with respect to the appropriate timing of an MRI was medically appropriate.

b. Physical Therapy

McGiboney next contends Dr. Haggard "may be liable" for supervising "others" who discontinued his physical therapy at STARS. Dkt. 73-1, at 19. Like municipal liability, supervisory liability under § 1983 may not be based on the doctrine of respondeat superior. *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009) ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own

---

[29] McGiboney does not cite to any evidence in the record to suggest Dr. Haggard's decision regarding McGiboney's MRI *was* financially motivated.

misconduct."). Thus, Dr. Haggard cannot be sued simply because she is the Medical Director and/or supervisor for Corizon. *Id*. at 677. Rather, McGiboney must submit evidence that Dr. Haggard participated in the alleged constitutional violation by either: (1) "setting in motion a series of acts by others"; (2) "knowingly refusing to terminate a series of acts by others," which Dr. Haggard knew or reasonably should have known "would cause others to inflict a constitutional injury"; (3) failing to act or improperly acting in "the training, supervision, or control" of her subordinates; (4) "acquiescing in the constitutional deprivation"; or (5) engaging in "conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1205–09 (9th Cir. 2011) (cleaned up).

Here, McGiboney simply asserts "[d]epending on her subjective intent, Defendant Haggard may be liable on McGiboney's § 1983 claims" for "the actions of others she supervised in which she was not personally involved, *i.e.*, insufficient number of bladder catheters provided, recommended aggressive physical therapy denied." Dkt. 73-1, at 4–5. McGiboney fails to identify: (1) who the "others" Dr. Haggard purportedly supervised were; (2) how Dr. Haggard participated in the purported constitutional violations; or (3) any link between actions taken by Dr. Haggard and his purported constitutional injury.

Moreover, as with Dr. Haggard's initial decision to deny the MRI request, McGiboney does not submit competent evidence to suggest the discontinuation of his physical therapy constituted a constitutional deprivation. For instance, McGiboney first argues the discontinuation of his physical therapy in 2018 ran counter to the recommendations of Dr. Choutka. Notably, however, Dr. Choutka testified that McGiboney received the physical therapy he recommended in 2018, and confirmed he did

not have concerns with any of the post-op care Corizon provided McGiboney, including physical therapy. Dkt. 69-8, at 65:9–11; 67:13–15; 68:2–18. Although McGiboney claims he did not receive the physical therapy recommended by Dr. Choutka, the evidence in the record—including Dr. Choutka's testimony—refutes this contention. *Id.*; *see also* Dkt. 69-2, ¶¶ 30, 31, 34, 38.

McGiboney also does not offer any evidence or testimony from a Corizon or outside provider to suggest that his physical therapy was inadequate. Instead, McGiboney attempts to create an issue of fact with respect to whether his discharge from STARS was related to the letter his daughter wrote to his STARS physical therapist. *See, e.g.*, 73-2, ¶¶ 30–37; Dkt. 73-1, at 11–12. For several reasons, such allegations are immaterial.

First, there is no evidence Dr. Haggard had any involvement—whether personal or supervisory—in the discontinuation of McGiboney's physical therapy at STARS. Second, it is undisputed that Christine Olen, a physical therapist for St. Alphonsus—and not for Corizon—discharged McGiboney from STARS. Dkt. 45-6, at 63–65. Third, the record shows Corizon officials decided to continue McGiboney's physical therapy at STARS despite potential security concerns raised by his daughter's letter, and communicated this to both Olen and McGiboney. Dkt. 68-7, ¶ 12; 68-1, ¶¶ 60–62. Fourth, and most importantly, McGiboney does not put forth any evidence to show that his November 21, 2018 discharge from STARS was medically unacceptable.

The Corizon Defendants' experts opine that additional off-site physical therapy was not required after November 21, 2018. Dr. Pikus concluded McGiboney was "appropriately referred offsite to [STARS] for extensive rehab, which he underwent from April 2018 until

he was discharged on November 21, 2018, at which time his progress plateaued . . . McGiboney continued physical therapy at the prison, and he continued to be seen regularly for chronic care and follow up visits." Dkt. 69-22, at 15. Following his 2019 embolization, McGiboney also underwent physical therapy both at the prison and offsite at St. Alphonsus, including pool therapy. *Id*. at 16. Corizon's second medical expert, Dr. Robert D. Jones, a family practitioner and former Medical Director at multiple prisons, also concluded that McGiboney received appropriate physical therapy.[30] Dkt. 69-19, at 18. Dr. Jones noted the course of physical therapy Dr. Choutka recommended was completed at both STARS and onsite at the prison. *Id*. McGiboney was also instructed in a home exercise program (HEP) to perform at the prison during his STARS treatments and to continue once he completed his treatment at STARS. *Id*. Dr. Jones explained a HEP is to help maintain the progress that an inmate completes during the course of offsite therapy. *Id*. McGiboney does not address either Dr. Pikus or Dr. Jones's expert opinions.

Rather than submitting evidence to suggest additional offsite physical therapy was required in 2018—or attempting to refute the opinions of the Corizon Defendants' medical experts—McGiboney suggests that whether Dr. Haggard was financially motivated to discontinue McGiboney's aggressive physical therapy is a question of fact precluding summary judgment. Dkt. 73-1, at 20. Again, McGiboney skips the first part of the subjective element of deliberate indifference and focuses solely on the second. While

---

[30] McGiboney also implies he was denied the aggressive physical therapy Dr. Choutka recommended because he was not provided a Bioness device after his surgeries in 2018. Dkt. 73-2, ¶ 41. However, McGiboney does not cite any evidence that Dr. Choutka ordered a Bioness device. In his expert report, Dr. Jones concluded there is no record that Dr. Choutka ordered a Bioness device. Dkt. 69-19, at 18.

attempting to create an issue of fact with respect to Dr. Haggard's motivation, McGiboney neglects to first submit evidence to show either that the physical therapy he received was inadequate, or that additional offsite physical therapy beyond November 21, 2018, was medically necessary. Dr. Haggard's motivation is not relevant in the absence of evidence that the discontinuation of McGiboney's offsite physical therapy was "medically unacceptable under the circumstances."[31] *Toguchi*, 391 F.3d at 1058.

In the absence of competent evidence to show that the discontinuation of his offsite physical therapy was medically unacceptable and chosen in conscious disregard of a risk to his health, McGiboney's claim against Dr. Haggard for purportedly supervising others who discontinued his therapy cannot survive summary judgment. Further, McGiboney does not submit any evidence to suggest that Dr. Haggard was in any way involved in the discontinuation of his physical therapy—either personally or as a supervisor. McGiboney's allegation that Dr. Haggard discontinued physical therapy because she was improperly motived by financial incentives is accordingly baseless.

> c.   Access to catheters

McGiboney also suggests Dr. Haggard supervised "others" who were responsible for providing him with an insufficient number of bladder catheters. Dkt. 73, at 5. McGiboney again fails to identify any facts to suggest Dr. Haggard supervised unnamed others who did not provide him with an adequate catheter supply. McGiboney also does

---

[31] Even if Dr. Haggard was financially motivated (which, again, there is no evidence in the record to support), McGiboney has not shown she made unacceptable medical decisions, notwithstanding such alleged motivation.

not attempt to establish a link between any actions taken by Dr. Haggard and whomever denied him catheters, nor a causal link between Dr. Haggard's conduct and his injury. This claim also accordingly fails as a matter of law. *Iqbal*, 556 U.S. at 679.

In addition to the dearth of facts to support his claim for supervisory liability, there is no evidence to satisfy the subjective element of a deliberate indifference claim against Dr. Haggard with respect to McGiboney's catheter supply. McGiboney testified during his deposition that Corizon forced him to reuse catheters when self-cathing after his March 2018 surgeries and again in 2020 when he was moved from ISCC to ISCI. Dkt. 73-9, Ex. 11, at 213:10–219:10. Accepting such testimony on summary judgment, McGiboney still fails to identify any facts to suggest Dr. Haggard was aware that he was denied an adequate catheter supply. McGiboney's testimony regarding his access to catheters makes no mention of Dr. Haggard and does not suggest that he or others informed her—either in writing or in person—about the catheter issue. *Id*. Nor does McGiboney set forth any other evidence to suggest Dr. Haggard was aware of, and intentionally disregarded, his lack of access to a sufficient supply of catheters.

In sum, McGiboney fails to state a claim for supervisory liability against Dr. Haggard based on an inadequate supply of catheters.

### d.  Barrow Institute and Dr. Jutzy Letters

As mentioned, on summary judgment, McGiboney submitted a June 3, 2019 letter from Drs. Andrew Ducruet and Michel T. Lawton from the Barrow Neurological Institute, Dkt. 73-7, at 17 ("Barrow letter"), as well as an October 21, 2019 letter from Dr. Jutzy, *Id*. at 21, ("Jutzy letter"). The Barrow letter recommends "intervention," beginning with a

repeat MRI and spinal angiogram, and ultimate "surgical removal" of McGiboney's AVM. *Id*. at 17. The Jutzy letter recommends that McGiboney be evaluated "at Barrow's Neurological Institute." *Id*. at 21. Although he highlighted both letters in his SDF, McGiboney did not address the relevance of either letter on summary judgment. Dkt. 73-2, ¶¶ 46, 61. McGiboney did not argue the letters defeated summary judgment or attempt to connect the letters in any way to his claims for deliberate indifference. *See generally* Dkt. 73-1.

However, in his subsequent Response to the Corizon Defendants' Motion to Strike, McGiboney argues for the first time that he provided the Barrow letter and Jutzy letter to Dr. Haggard and Corizon, and that their refusal to acknowledge receipt of the letters, or to consider the letters' contents, is critical evidence of their deliberate indifference to his serious medical condition. Dkt. 80, at 6–7, 10–11. Even if the Court disregarded the evidentiary objections outlined in the Corizon Defendants' Motion to Strike, as well as McGiboney's failure to address the letters on summary judgment, there are two problems with McGiboney's argument.

First, the Jutzy letter states, in its entirety: "Joshua McGiboney was seen and examined in November 2011. He was noted to have a complex thoracic spinal AVM. I recommended evaluation at Barrow's Neurological Institute in Phoenix, Arizona, at that time. My recommendation has not changed." Dkt. 73-7, at 21. It is undisputed that Dr. Jutzy has not seen or treated McGiboney since 2011. In his letter, Dr. Jutzy gives no indication that he has reviewed McGiboney's medical records since that time, or that he is aware of the repeated surgeries and extensive medical treatment McGiboney has had since

2011.

Similarly, the Barrow letter (which is not signed by a provider) recommends a repeat spinal angiogram with possible re-embolization of McGiboney's AVM. Dkt. 73-7, at 17. McGiboney has never been seen or treated by the physicians at the Barrow Institute. It is unclear what medical records they reviewed prior to drafting the letter. In addition, the Barrow letter is dated June 3, 2019. *Id*. McGiboney has had significant treatment—including an additional embolization, MRI, and angiogram—since that date. Dkt. 69-2, ¶¶ 32–34.

In short, both letters are of limited probative value. It is impossible to speculate what Dr. Jutzy or the physicians at the Barrow Institute would recommend: (1) after a full review of McGiboney's medical history; (2) if they had treated McGiboney in the last five years (or, with respect to the physicians at the Barrow Institute, ever); or (3) if they were aware of McGiboney's condition today. Nor is either letter in any way relevant to any of the specific instances of deliberate indifference McGiboney raises on summary judgment.

Second, and more importantly, a "difference of medical opinion" as to the need to pursue one course of treatment over another is "insufficient, as a matter of law, to establish deliberate indifference." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled on other grounds, Peralta v. Dillard*, 744 F.3d 1076 (2014); *see also Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Regardless of the treatment Dr. Jutzy and the physicians at the Barrow Institute would recommend, McGiboney cannot survive summary judgment without evidence that the medical treatment he received was medically unacceptable under the circumstances, and that the course of treatment he actually underwent was chosen in

conscious disregard of an excessive risk to this health. *Jackson*, 90 F.3d at 332. The Jutzy letter and Barrow letter are not relevant to either of these critical aspects of a deliberate indifference claim.

The Ninth Circuit's decision in *Sanchez* is instructive on this point. In *Sanchez*, a prison doctor, during the course of treatment, advised the plaintiff inmate that surgery was necessary for the inmate's chronic perirectal abscess. *Sanchez*, 891 F.2d at 242. The plaintiff was subsequently seen by a physician's assistant, prison doctors, and outside physicians on numerous occasions. *Id*. Plaintiff received substantial treatment and medication for his condition but never had surgery. The medical treatment at issue helped the plaintiff's symptoms but could not cure his recurrent condition. *Id*. In addition, subsequent medical personnel did not recommend surgery. In affirming summary judgment, the Ninth Circuit held "[a]t most, Sanchez has raised a difference of medical opinion regarding his treatment. A difference of opinion does not amount to a deliberate indifference to Sanchez's serious medical needs." *Id*. (citations omitted).

The circumstances in *Sanchez* are similar to those here. Dr. Jutzy first recommended the Barrow Institute in 2011. Since that time, McGiboney has seen countless nurses, physician assistants, physical therapists, doctors, and neurosurgeons, and has had significant treatment, including multiple surgeries, extensive medication, and both offsite and onsite physical therapy. *See generally* Dkt. 69-2. As Dr. Choutka testified, McGiboney's condition is stable and has improved. Dkt. 69-8, at 90:9–13. Should anything change, Dr. Choutka also testified that adequate treatment for McGiboney's AVM is available locally, and he could perform a resection surgery himself if necessary. *Id*. at 83:4–

11, 84:22–24; 86:21–87:8. Moreover, Dr. Choutka—and every other neurosurgeon who has treated McGiboney (including Dr. Jutzy)—have consistently recommended *against* resection surgery given the exceedingly high risk of paraplegia. Dkt. 45, ¶¶ 10–11; Dkt. 69-2, ¶¶ 7, 24, 32, 35. The Corizon Defendants' neurosurgeon expert agrees with this assessment, noting microsurgical resection has been too risky to date. Dkt. 69-22, at 19. Thus, as in *Sanchez*, the Jutzy and Barrow Institute letters—to the extent they even constitute a difference of opinion among medical providers[32]—do not change the Court's conclusion that McGiboney has not met the standard of deliberate indifference to his serious medical needs required for liability under § 1983.[33] *Sanchez*, 891 F.2d at 242.

### 4. Claims against Corizon

McGiboney devotes the bulk of his Response to the Corizon Defendants' Motion for Summary Judgment to arguing the enforcement of two policies: "Corizon's secret utilization management process," and "the lack of any administrative remedies in IDOC's grievance policy for inmates to use to try to obtain care denied by Corizon," deprived him

---

[32] As noted, neither letter implies the course of treatment McGiboney has received is medically unacceptable; the letters instead recommend the Barrow Institute as a potential treatment option. However, the "Eighth Amendment does not provide a right to specific treatment." *Coffelt v. Corr. Med. Servs.*, No. 1:CV07-419-EJL, 2009 WL 1583468, at *5 (D. Idaho June 4, 2009), *aff'd Coffelt v. Dawson*, 402 Fed. App'x 210 (9th Cir. 2010), (quoting *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Because the evidence shows Idaho specialists, including Dr. Montalbano and Dr. Choutka, are able to address (and are properly addressing) McGiboney's AVM, referral to the Barrow Institute is not medically necessary. Dkt. 69-22, 19–20.

[33] Although, in his Complaint and PI Motion, McGiboney sought release from prison and/or a transfer to be treated at the Barrow Institute, he does not address this form of relief in his Response brief. Although McGiboney highlights his many grievances requesting treatment at the Barrow Institute in his SDF, he does not argue treatment at the Barrow Institute is medically necessary, or even suggest resection surgery is necessary, on summary judgment.

of his right to adequate medical care. Dkt. 73-1, 21–26. As noted, to state a *Monell* claim against Corizon, McGiboney must show that: (1) he was deprived of a constitutional right; (2) Corizon had a policy or custom; (3) the policy or custom amounted to deliberate indifference to his constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe*, 237 F.3d at 1110–11.

McGiboney's *Monell* claim against Corizon fails as a matter of law because, for the reasons set forth in detail above, McGiboney has not established he was deprived of a constitutional right. "While *Monell* claims cannot predicate municipal liability for constitutional violations of its officers under the theory of respondeat superior, such claims are still contingent on a violation of constitutional rights." *Lockett v. Cty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (citing *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994)) (holding municipal defendants could not be held liable where no constitutional violation occurred).

As the Ninth Circuit explained in *Lockett*, *Monell* claims "require a plaintiff to show an underlying constitutional violation." 977 F.3d at 741. For example, the Supreme Court has held that a jury's determination that an individual officer did not use excessive force precluded municipal liability for excessive force. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm."); *see also* Model Civ. Jury Instr. 9th Cir. 9.5 (providing that an element of a *Monell* claim is that the plaintiff must prove "the acts of [name a defendant's official or employee] deprived the plaintiff of his . . . particular

rights under . . . the United States Constitution") (cleaned up). "While *Monell* liability is limited to the acts of the municipality, [a prison official's] conduct still constitutes an element of a *Monell* claim." *Lockett*, 977 F.3d at 741 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–480 (1986)).

Here, McGiboney argues Corizon has a "secret utilization management process that allows Corizon to even deny care ordered by Corizon providers and, under Corizon's all-risk contract with IDOC, Corizon benefits financially from any decision denying care to McGiboney." Dkt. 73-1, at 21. To prevail on his municipal liability claim, McGiboney must first set forth evidence that Dr. Haggard (or another named Defendant) denied him necessary medical care in reckless disregard for his health. As explained in detail, McGiboney does not do so on summary judgment. Because McGiboney fails to support his deliberate indifference claim against Dr. Haggard—or any other Defendant—his *Monell* claim against Corizon fails as a matter of law. *Lockett*, 977 F.3d at 742; *see also Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir. 2002) ("Exoneration of [the officer] of the charge of excessive force precluded municipal liability for the alleged unconstitutional use of such force.").

### 5. *Injunctive Relief*

As noted, McGiboney sought injunctive relief in both his Complaint and PI Motion. McGiboney initially requested an order releasing him from confinement so he could seek medical care from the Barrow Institute and an order to ensure he received "adequate and meaningful medical care and treatment to sustain his life." Dkt. 10-1, at 1. As explained in the PI Order, the Court denied McGiboney's request for medical parole because a petition

for writ of habeas corpus is the exclusive remedy for a prisoner seeking an immediate or speedier release from prison. Dkt. 40, at 19 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)). On summary judgment, McGiboney does not address this issue, and does not request injunctive relief in the form of medical parole.

The Court granted the PI Motion, and entered the PI Order, to ensure McGiboney received access to adequate medical care, including, among other things, immediate neurosurgery and radiology consultations and the treatment recommended at such consultations. *Id*. at 24. The Court determined such relief was appropriate because the "inconsistencies and gaps in McGiboney's medical treatment" suggested McGiboney was likely to succeed on the merits of his Eighth Amendment claim. *Id*. at 16. Now that the record is fully developed, however, the evidence shows that there were not, in fact, gaps and inconsistencies in McGiboney's medical treatment.

For example, while the record on July 11, 2019, when the PI Order issued, suggested the Corizon Defendants had yet to schedule McGiboney for the neurosurgery and interventional radiology ("IR") appointments recommended after McGiboney's spinal angiogram on March 22, 2019, it is now clear that a new consultation request for neurosurgery and IR was placed on April 3, 2019, and approved on April 5, 2019. Dkt. 69-2, ¶ 31. The IR Clinic scheduled McGiboney for the first available appointment on June 11, 2019. *Id*. McGiboney was seen at the St. Alphonsus IR Clinic on June 11, 2019. *Id*., ¶ 32. McGiboney initially declined the embolization treatment recommended by the Neuroradiology team and Dr. Choutka, both during his June 11, 2019 visit, and later when he was seen by Dr. Choutka on July 30, 2019. *Id*. Thus, unbeknownst to the Court at the

time the PI order issued, the Corizon Defendants did ensure McGiboney received the neurosurgery and IR consultations recommended on March 22, 2019, and attempted to provide McGiboney with the embolization treatment his providers recommended, but McGiboney declined such treatment.[34] *Id.* at ¶¶ 31–33.

Another example is the Court's finding that Dr. Haggard and others repeatedly denied McGiboney an MRI recommended by their own, and outside, providers. Dkt. 40, at 16. The record now shows that no outside or Corizon provider recommended an MRI until March of 2017, and that Dr. Haggard's denial of this request was appropriate because McGiboney did not present symptoms of AVM progression at that time.[35] Eight months later, when McGiboney did show symptoms of AVM progression, Dr. Haggard ordered an MRI, which McGiboney received. Dkt. 69-2, ¶ 22. Dr. Haggard's decisions with respect to the MRI were medically appropriate. Dkt. 69-22, at 11–13, 17–18.

There are countless instances where the allegations in McGiboney's Complaint and PI Motion are not supported on summary judgment. The Court does not outline each such instance here because McGiboney entirely ignores his request for injunctive relief in his

---

[34] McGiboney later changed his mind, and, on October 17, 2019, another embolization was performed without complications. *Id.*, ¶ 33.

[35] In his Complaint and PI Motion, McGiboney alleged that he had worsening symptoms in early 2016, and that various Corizon and outside providers made MRI recommendations or requests throughout 2016, but that such requests were denied and/or ignored. Dkt. 40, at 4–6. On summary judgment, the undisputed evidence instead shows an MRI was not requested—by either a Corizon or an outside provider—until March 27, 2017. Dkt. 69-2, ¶¶ 6–19.

Response to the Corizon Defendants' Motion for Summary Judgment.[36] McGiboney also failed to respond to the Corizon Defendants' argument, in their Motion for Summary Judgment, that there is no evidence to support injunctive relief. Dkt. 69-1, at 26–27.

Because McGiboney does not address the merits of his claim for injunctive relief in his Response to the Corizon Defendants' Motion for Summary Judgment, he has forfeited this claim. *Padgett v. Wright*, 587 F.3d 983, 985 n. 2 (9th Cir. 2009); *Reliance Ins. Co. v. Doctors Co.,* 299 F. Supp. 2d 1131, 1154 (D. Haw. 2003) ("Failure to raise issues in opposition to summary judgment functions as a waiver."); *see also Samica Enters. LLC v. Mail Boxes Etc., Inc.,* 460 Fed. Appx. 664, 666 (9th Cir. 2011) ("Arguments not raised in opposition to summary judgment . . . are waived."); *Handa v. Clark*, 401 F.3d 1129, 1132 (9th Cir. 2005) ("Briefly stated, a party cannot treat the district court as a mere ill-placed bunker to be circumvented on his way to this court where he will actually engage his opponents.").

### 6. *Grievances*

In his SDF, McGiboney detailed twenty-nine grievances and/or Offender Concern Forms he has submitted regarding his medical care since April 18, 2017. *See generally*, Dkt. 73-2. With the exception of his claim of an inadequate catheter supply, McGiboney does not offer argument with respect to any of these grievances in his Response to the

---

[36] McGiboney also seems to implicitly concede his claim for injunctive relief in the Conclusion section of his Response brief by asking the Court to "deny summary judgment on the Corizon Defendants' Motion for Summary Judgment on McGiboney's § 1983 claim for *damages* related to medical treatment." Dkt. 73-1, at 28 (emphasis added). Although the PI Order has expired, McGiboney does not ask the Court to deny summary judgment on his § 1983 claim for injunctive relief with respect to his medical treatment.

Corizon Defendants' Motion for Summary Judgment.[37] McGiboney does cite certain grievances in various footnotes in his Response brief, but makes no attempt to show the medical treatment (or lack thereof) described in the grievances constituted deliberate indifference to his serious medical needs. *See*, *e.g*., Dkt. 73-1, at 11 n. 33, 36; 19 n. 56.

McGiboney also does not connect *any* specific grievance to actions taken by Dr. Haggard. *Id*. Liability under § 1983 arises only upon a showing of personal participation by the defendant. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to prevent them." *Id*. McGiboney has not put forth any documentation or testimonial evidence to show Dr. Haggard knew about the grievances cited in his SDF, or made any decisions related to them. Because McGiboney fails to identify any personal participation by Dr. Haggard—or any other Defendant—in the myriad grievances he recites in the SDF, the Court will not manufacture arguments with respect to such facts on summary judgment.[38] Dkt. 73-2, ¶¶ 18, 38, 39–40, 42, 44, 48, 50–60, 62, 65–70, 73–74, 102–103.

---

[37] McGiboney contends a review of his medical appeals demonstrates "that not one of McGiboney's medical appeals are shown as having been granted." Dkt. 73-1, at 24. While Defendants dispute this contention, whether or not an inmate is provided adequate medical care in prison does not depend on the adequacy of a prison's grievance process. "There is no constitutional right to a grievance system[.]" *Mintun*, 2008 WL 711636, at *7; *see also Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) (The law is clear that "[t]here is no legitimate claim of entitlement to a [prison] grievance procedure"); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (explaining where defendants' only role in a civil rights action "involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983").

[38] The same holds true for the single grievance against IDOC McGiboney references in his SDF (regarding his access to the gym). *Id*., ¶ 23. Because McGiboney does not offer any argument with respect to this grievance in his Response to Warden Ramirez's Motion for Summary Judgment—or attempt to connect the grievance to his Eighth Amendment claim against Ramirez—the Court will not further address it.

*7. First Amendment Retaliation*

McGiboney's final cause of action against the Corizon Defendants is his First Amendment Retaliation claim against Defendant Povar. "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements": (1) "An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (citing *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000)).

In his Complaint, McGiboney alleged that Povar told him, during McGiboney's appointment on April 13, 2017, that because McGiboney "had filed a civil rights action," McGiboney was "done." Dkt. 2, ¶ 39. During his deposition, McGiboney testified Povar lunged toward him during the April 13, 2017 visit and stated something to the effect of: "Look, dude, you ain't got not nothing coming because you're filing suits against people." Dkt. 73-9, Ex. 11 at 182:2–7.[39] McGiboney explained he took Povar's threat to mean he would not receive an MRI or specialist consult because of his prior lawsuit. *Id*. at 184:7–8.

On summary judgment, Povar contends McGiboney's retaliation claim fails because there is no evidence Povar knew McGiboney had filed a civil rights suit (and had thus

---

[39] When questioned whether Povar was referring to a specific individual against whom McGiboney had filed suit, McGiboney explained, "I don't remember him actually saying against who. He just said something about, like 'Oh, you want to sue people or file a suit,' or something." *Id*. at 183:1–5.

engaged in protected activity), and because it is undisputed that Povar's alleged threat to withhold medical treatment did not chill McGiboney from exercising his First Amendment rights. McGiboney responds that there are issues of fact precluding summary judgment with respect to Povar's knowledge of McGiboney's protected conduct,[40] but neglects to address Povar's second argument regarding the chilling effect of Povar's statement. Because the Court finds the latter issue to be dispositive, it does not further address the parties' arguments regarding Povar's knowledge of McGiboney's protected activity.

Povar argues McGiboney's retaliation claim fails because it is undisputed that Povar's threat did not chill McGiboney's exercise of his First Amendment rights since McGiboney submitted a grievance a mere five days after Povar purportedly threatened him. Dkt. 69-1, at 30. However, a plaintiff is not required to have actually been chilled by a defendant's actions in order to state a retaliation claim. *Mendocino Envtl. Ctr v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . the proper inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First

---

[40] In his Complaint and during his deposition, McGiboney did not identify the specific "civil rights suit" to which Povar was referring. Dkt. 2, ¶ 39; Dkt. 73-9, Ex. 11 at 183:1–7. On summary judgment, McGiboney suggests Povar was referencing McGiboney's 2011 civil rights suit against Dr. Agler. Dkt. 73-1, at 28. McGiboney argues there are questions of fact regarding Povar's knowledge of McGiboney's 2011 suit because: (1) McGiboney testified during his deposition that Povar threatened him for bringing a civil rights suit; (2) both Dr. Agler and Povar worked for Corizon at ISCI and McGiboney's suit against Dr. Agler went to trial two months after Povar started working for Corizon; (3) Povar's April 13, 2017 progress note for McGiboney's visit recorded that McGiboney threatened to "get his lawyers to sue Defendant Povar"; and (4) Povar testified during his deposition that he only had a vague recollection of his encounter with McGiboney and relied on his treatment notes to remember the April 13, 2017 incident. Dkt. 73-1, at 28.

Amendment activities.") (cleaned up). Thus, McGiboney does not have to demonstrate that his own speech was actually inhibited or suppressed to state a retaliation claim against Povar. *Rhodes*, 408 F.3d at 569 ("Rhodes' allegations that his First Amendment rights were chilled, though not necessarily silenced, is enough to perfect his claim.").

In his Complaint, McGiboney alleged Povar's actions "would have the effect of chilling a person of ordinary firmness from exercising" First Amendment rights. Dkt. 2, ¶ 90.B. Beyond this conclusory allegation, McGiboney does not offer any evidence or argument on summary judgment to suggest he was chilled by Povar's threat.[41] Nor is there any evidence that Povar followed through with his threat to deny McGiboney medical treatment. In fact, Povar treated McGiboney again less than three weeks after the April 13, 2017 confrontation, and renewed McGiboney's medications on May 2, 2017. Dkt. 69-2, ¶ 20.

Although McGiboney does not need to establish he was actually silenced by Povar's conduct, he does need to present facts to suggest Povar's statement would chill or silence an individual of ordinary firmness from future First Amendment activities. To do so, he must show that he suffered harm as a result of an adverse action, since harm that is more

---

[41] McGiboney also alleged that "all Defendants" engaged in retaliation in his Complaint, but did not provide specific allegations to support a reasonable inference that any other Defendant knew McGiboney had filed a civil rights suit, was motivated by that knowledge, and engaged in an adverse action not reasonably related to a penological goal. The Court according dismissed McGiboney's retaliation claim with respect to every Defendant but Povar. Dkt. 7, at 20, 32. While McGiboney's conclusory allegations against Povar (liberally construed because McGiboney was pro se when he initially filed his Complaint) were sufficient to state a retaliation claim before any discovery, such bare allegations are insufficient to survive summary judgment. *Anderson*, 477 U.S. 248 (noting a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial.") (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 288 (1968)).

than minimal will almost always have a chilling effect.[42] *Rhodes*, 408 F.3d at 567–68 n. 11; *see also Gomez v. Vernon*, 255 F.3d 1118, 1127–28 (9th Cir. 2001) (finding prisoner established harm by claiming he had to quit his law library job in the face of repeated threats by defendants to transfer him because of his complaints about the administration of the library); *Resnick*, 213 F.3d at 449 ("In a constitutional tort, as in any other, a plaintiff must allege that the defendant's actions cause him some injury."). A retaliatory action can be so insignificant that it "cannot reasonably be expected to deter protected speech[.]" *Coszalter v. City of Salem*, 320 F.3d 968, 975–76 (9th Cir. 2003). Minor acts such as "bad mouthing" and verbal threats usually cannot reasonably be expected to deter protected speech and therefore do not violate a plaintiff's First Amendment rights. *Id*. (discussing *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998)).

Drawing all inferences in favor of McGiboney, Povar's alleged statement, while improper, does not amount to the type of threat or intimidation of impending punishment sufficient to deter a person of ordinary firmness. *See, e.g., Bolden v. Arana*, Case No. 17-cv-05607-PJH, 2020 WL 1677344, at *3 (N.D. Cal. Apr. 6, 2020) (noting "threats alone are not sufficient," and granting summary judgment where prison official stated "I'll get you for that" when plaintiff inmate said he would file a grievance if his property was not returned); *Jenkins v. Caplan*, No. 02-5603 RMW (PR), 2012 WL 12904629, at *5–6 (N.D. Cal. March 30, 2012) (finding there was no chilling effect despite prison officer's response

---

[42] Of course, McGiboney generally alleged in his Complaint that he *was* denied adequate medical care. This type of harm would chill an individual of ordinary firmness from engaging in First Amendment activity. On summary judgment, however, McGiboney does not attempt to connect Povar's statement to any specific medical care he was purportedly denied. Nor, as detailed herein, does McGiboney survive summary judgment on his claims of inadequate medical care against any Defendant.

to prisoner who requested to be housed with a nonsmoker, stating, "Fuck that, this is my building and I do what I want to do" and "If you don't like my [inappropriate conduct] what are you going to do about it?") (alteration in original), *aff'd* 548 F. App'x 505, 506 (9th. Cir. 2013); *Wray v. Garton*, No. 3:18-cv-01617-SB, 2020 WL 1325354, *adopting report and recommendation*, 2020 WL 1330234, at *4 (D. Or. March 2, 2020) (finding no reasonable jury could conclude that prison officer's vague threat to target prisoner for rule violations if the prisoner continued to file grievances would chill or silence a person of ordinary firmness from pursuing a grievance); *Martin v. Dewsnup*, No. 6:11-cv-06420-AC, 2016 WL 614429 (D. Or. Feb. 14, 2016), *adopting report and recommendation*, 2015 WL 13730889, at *20 (finding prison guard's verbal abuse and tampering with inmate's food in retaliation for filing grievances "may have been cruel, but they were isolated events and were not so cruel and threatening that they would have caused an individual of ordinary firmness to stop exercising his or her First Amendment rights").

Because McGiboney does not show there is a genuine dispute for trial regarding— or even address—whether Povar's comment would chill or silence an individual of ordinary firmness from exercising his First Amendment rights, this claim fails as a matter of law. *Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

### 8. *Conclusion*

In his Response to the Corizon Defendants' Motion for Summary Judgment, McGiboney argues the "core" of his § 1983 case "is **not** about whether Corizon Defendants provided adequate medical care and treatment. The core of McGiboney's § 1983 case is

whether the Corizon Defendants were deliberately indifferent to his medical needs." Dkt. 73-1, at 3, 18 (emphasis in original). This represents a fundamental misunderstanding of an Eighth Amendment claim for inadequate medical treatment. If the Corizon Defendants provided adequate medical care and treatment—as all of the evidence on summary judgment shows—they could not have acted with deliberate indifference to McGiboney's medical needs. The Corizon Defendants could not "knowingly and unreasonably" disregard "an objectively intolerable risk of harm to the plaintiff" by providing appropriate medical treatment. *Farmer*, 511 U.S. at 846.

In sum, McGiboney's deliberate indifference claims fail as a matter of law, as do his claim for injunctive relief and First Amendment retaliation. Accordingly, the Court must grant the Corizon Defendants' Motion for Summary Judgment.

### E.  Warden Ramirez's Motion for Summary Judgment (Dkt. 68)

Given McGiboney's concessions regarding his state law claims on summary judgment, McGiboney's remaining claim against Warden Ramirez is his official-capacity claim for injunctive relief. A claim against a government officer in his official capacity is equivalent to a suit against the governmental entity itself. *McRorie v. Shimoda*, 795 F.2d 780, 783 (9th Cir. 1986). "[A] governmental entity is liable under § 1983 only where the entity itself is a 'moving force' behind the [constitutional] deprivation; thus, in an official capacity suit, the entity's 'policy or custom' must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citations omitted).

On summary judgment, McGiboney seeks injunctive relief:

MEMORANDUM DECISION AND ORDER - 66

> [R]equiring the Warden to implement some process whereby medical decisions of Corizon providers may be independently reviewed by the Warden or his designee to determine if those medical decisions meet constitutional minimums and, if the Warden or his designee determine that those medical decisions do not meet constitutional minimums, the Warden be empowered to reverse those "unconstitutional" medical decisions made by Corizon providers at ISCI.

Dkt. 73, at 2. This is the first time McGiboney has requested this specific form of injunctive relief, as he previously sought injunctive relief ordering Defendants to release him from prison and to provide him with adequate medical care. Dkt. 40.

The PLRA sets forth a number of limitations on the scope of prospective injunctive relief in civil litigation regarding prison conditions:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A).

The prison-wide injunctive relief McGiboney requests is not only well beyond that necessary to correct the purported violation of McGiboney's constitutional rights, but is also foreclosed by McGiboney's failure to support his claims of inadequate medical care on summary judgment. The scope of injunctive relief is dictated by the extent of the violation established." *Clement v. California Dept. of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004); *Lewis v. Casey*, 518 U.S. 343, 349 (1996) (holding that in issuing an injunction, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); *Missouri v. Jenkins*, 515 U.S. 70, 88–89 (1995) ("[T]he

nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation.") (citation and internal quotation marks omitted)). As such, if a plaintiff does not establish the violation of a Federal right, the Court cannot order injunctive relief. *Lewis*, 518 U.S. at 360 n. 7 ("Courts have no power to presume and remediate harm that has not been established.").

Because, as explained above, McGiboney's Eighth Amendment claims do not survive summary judgment, his claim for injunctive relief against Warden Ramirez also fails as a matter of law.

## V. CONCLUSION

Notwithstanding today's Decision, the Court recognizes that McGiboney has suffered immeasurably as a result of his AVM. The Court sympathizes deeply with McGiboney and realizes it would be devastating to have such a significant medical condition, particularly in prison. In issuing its Decision today, the Court in no way seeks to diminish the suffering McGiboney has endured as a result of his AVM. While the Court regrets that its sympathy is likely cold comfort, the Defendants are not responsible for McGiboney's circumstances, and, as the evidence illustrates, have provided him with appropriate medical treatment. The Court must grant both motions for summary judgment because McGiboney fails to show a triable issue of deliberate indifference on his Eighth Amendment claims.[43]

///

---

[43] As discussed, the complete failure of proof on an essential element of McGiboney's First Amendment retaliation claim also warrants summary judgment in favor of Defendant Povar.

## VI. ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. The Defendants' Joint Motion in Limine (Dkt. 63) is GRANTED;

2. Warden Ramirez's Motion for Summary Judgment (Dkt. 68) is GRANTED;

3. The Corizon Defendants' Motion for Summary Judgment (Dkt. 69) is GRANTED;

4. The Corizon Defendants' Motion to Strike (Dkt. 75) is DENIED as MOOT;

5. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: March 22, 2021

David C. Nye
Chief U.S. District Court Judge